**Robin VERHEL, a Minor, by Albert VERHEL, her Father and Natural Guardian, and Albert Verhel, individually, Respondents,**

v.

**INDEPENDENT SCHOOL DISTRICT NO. 709, a Public Corporation, Appellant (C7-82-1246),**

**Diane Williams, Respondent,**

**John Estes House, Respondent (C7-82-1246), Appellant (C3-82-1261),**

**Karen Ann Pitoscia and Frank R. Pitoscia, Respondents.**

**Nos. C7-82-1246, C3-82-1261.**

Supreme Court of Minnesota.

Dec. 21, 1984.

■

John D. Kelly and Richard Leighton, Duluth, for Independent School Dist. No. 709.

James D. Steiner, Joel W. Brodd, Minneapolis, for Verhel.

Richard H. Krochuck, Eric J. Magnuson, Minneapolis, for Pitoscia.

Robert H. Magie, III, James P. Paciotti, Duluth, for Williams.

Terry C. Hallenbeck, Duluth, for Estes House.

WAHL, Justice.

Twelve cheerleaders from Denfeld High School (Denfeld), Duluth, Minnesota, riding in a van, were involved in an automobile collision at 5 a.m., August 30, 1980, while they were "bannering" the homes of the school's football players in anticipation of the season's first game later that day. Robin Verhel (Verhel), one of the cheerleaders injured in the collision, and her father, Albert Verhel, brought suit against the drivers, cheerleader Karen Pitoscia (Pitoscia) and John House (House), for negligent operation of their vehicles, and against the school district and the cheerleaders' faculty advisor for negligent supervision of an authorized activity. The jury found for Verhel in the amount of $200,200 and for her father in the amount of $14,000. The jury in the special interrogatories indicated that each defendant was negligent and that the negligence of each was a direct cause of Verhel's injuries. It apportioned the percentages of comparative fault as follows: School District No. 709, 35%; House, 26%; the advisor, Diane Williams, 0%; and Pitoscia, 39%. The trial court issued its order for judgment based on the jury's verdict and subsequently denied all post trial motions. We affirm.

Cheerleading is a sanctioned extra-curricular activity at Denfeld High School. The school district regularly assigned and paid a faculty member to direct and sponsor the cheerleading organization. Diane Williams (Williams), the faculty sponsor in this case, had become a teacher at Denfeld the previous year upon her graduation from college. During that year she had been assigned to direct and sponsor the cheerleading squad. Other than that she had no prior supervisory experience. The Denfeld cheerleading squad for the 1980–81 schoolyear was chosen on April 1, 1980. Thereafter, its members met with Williams and drafted the cheerleading constitution.[1] The constitution was modeled upon the previous year's constitution and was subsequently approved by Denfeld's principal, Dr. Wayne Samskar (Samskar). The squad members also established their summer practice schedule. That schedule required the cheerleaders to practice three times a week during June and July, and five times in August. Practices were ordinarily held at the high school from 7 a.m. to 9 a.m. In bad weather, practices were held inside the high school. Williams was not required, according to her contract with the school district, to meet with the squad during the

1. Denfeld Cheerleading Constitution reads as follows:
  1. You are not allowed to miss any games. I realize there are times when emergencies arise, you must clear this with myself and the squad's captain.
  2. 3 unexcused practices during the summer will result in not being able to cheer for the first game of the season.
  3. 2 unexcused meetings will result in not being able to cheer for that week's game.
  4. 4 unexcused meetings and you will turn in your uniform.
  5. If you miss practice during the school week, you will be suspended for that week's game.
  6. Any meetings, games, or practices that are going to be missed must be cleared with the captain of the squad and myself.
  7. Work is not a legitimate excuse for not showing up at a scheduled event, whether it be a meeting, practice, or game.
  8. If there is a pep bus going to the game all girls must ride the bus *to* and *from* the game or they will not cheer. If you do not ride the bus back to Denfeld after the game you will be suspended for the next game.
  9. You must maintain a 2.5 grade point average.
  10. You are allowed one W a semester. You cannot have any U's present on your report card.
  11. All uniforms must be turned in 2 weeks after the final game of the season. They must be dry cleaned when they are turned in. A fine of $.50 will be issued for each day they are late in being turned in.
  12. You cannot wear your sweaters with blue jeans.
  13. Uniforms will be worn to school the day of the game.
  14. All girls will abide by the rules set up by the Minnesota State High School League.
  15. Girl's basketball games will be divided up between the Varsity Hockey Squad, the Varsity Basketball Squad, and the B-Squad Cheerleading Squads.
  16. You must be at the games 45 minutes prior to the start of the game.
  17. These rules will be followed and carried out amongst the squads.

summer months. Nevertheless, she voluntarily attended a few practices each month, ordinarily arriving at the end of the sessions. To maintain contact with the squad, Williams relied heavily on the two squad captains.

The opening game of the football season, against Grand Rapids, was to be held Saturday night, August 30. Earlier that day there was to be a school-wide pep rally. Although the official football season was beginning, classes did not start until the following week. Sometime in August the cheerleaders began to discuss "bannering," decorating with posters the homes of the football players for the opening game. On the morning of Monday, August 25, the cheerleaders met as usual for practice and following practice held their regular weekly meeting. Williams was in attendance. Members of the squad testified that they discussed their bannering plans at this meeting while Williams was present. They testified that they ascertained who was available to drive, obtained the names and addresses of the football players from the football coach, divided the names among themselves so that the parents of the players could be advised in advance of the bannering, and planned how and when to make the banners. According to the girls, Williams made no comment with respect to any of the arrangements discussed, but announced that she would be gone for the rest of the week.

Williams denies this discussion took place and testified that the most she heard was an offhand remark by one squad member to another after the meeting had concluded, which consisted of, "Hey, maybe we should go decorate some houses." She made no inquiry.

On Friday, August 29, the squad worked inside the high school, making between 30 and 60 banners. The squad captains had purchased supplies for the posters after getting a purchase order signed by Williams against the cheerleading fund before she left on Monday. They borrowed tape and scissors from the principal's office. At approximately 10 p.m. that Friday, Pitoscia was asked if she could get her parents' van to drive the squad around as they bannered the football players' homes. Pitoscia obtained permission from her father to use the van and began picking up members of the squad between 1 a.m. and 2 a.m. on Saturday. Pitoscia testified that at the time of the accident she was 17 years old, had been licensed to drive for 13 months, was very familiar with driving the van, and that the van was in good operating condition.

John House, the other driver in the collision, worked from 11 p.m. Thursday to 7 a.m. on the Friday preceding the accident. He then went home, slept until 2 p.m., had a salad to eat, and worked on his boat for several hours. At approximately 6 p.m., he and a friend took the boat out on the St. Louis River. Before leaving the river at 10 p.m., he consumed three beers. He then proceeded to Bucko's Bar, where he had two whiskey sours. After returning home briefly at approximately 12 o'clock midnight, he proceeded to the Palace Bar in Oliver, Wisconsin, where he consumed two more whiskey sours. He left the Palace Bar at approximately 2 a.m. and at approximately 3 a.m. had breakfast at a Perkins Restaurant. According to House, while he had felt somewhat the effects of the alcohol upon his arrival at the restaurant, he no longer felt those effects upon leaving at approximately 4 a.m. After giving a friend a ride home, House arrived at his home between 4:30 and 5 a.m. Because House was still hungry, he left again, this time going to a Taco John's.

The collision between Pitoscia's van and House's jeep occurred at approximately 5 a.m. in West Duluth at the corner of 59th Avenue West and Grand Avenue. The van, carrying 12 cheerleaders and one other student, was heading in a northerly direction on 59th Avenue West. House, who was returning from Taco John's, was driving his jeep westward on Grand Avenue. Because these streets do not intersect at right angles, the view to Pitoscia's right was partially blocked by a building which abuts the sidewalk. This intersection was famil-

iar to her, however, because her family's home is nearby. Pitoscia testified that she was tired at the time of the accident because she had played volleyball earlier that day and then had worked her shift at Hardee's Restaurant that evening. She also testified that she was aware that the cheerleaders had planned to have breakfast together at 6 a.m., but that at 5 a.m. they had bannered only about half of the players' homes. Pitoscia testified that she saw the stop sign that controlled her travel northward on 59th Avenue West and had slowed for it but rolled past it into the intersection. She gave varying accounts of how fast her vehicle was traveling. As she approached and entered the intersection she first looked right and could see only one-half of the block east of the intersection. She then looked left. Seeing no traffic, she again looked to the right. This time she saw House's jeep. She estimated that the van was halfway into the first lane of Grand Avenue, which is two lanes in each direction, and that House was about a "football field" away. She said the jeep was coming "fast" but she felt she could make it. Her van was in the third lane before she was aware of the possibility of an accident. At that time, she accelerated and swerved to the left. Upon impact, Pitoscia was thrown from the van, which rolled over on its top. Verhel, who had been seated in the middle of the first bench seat, was pinned in the van for an hour before emergency personnel could remove her.

House described the jeep's location as 30–40 feet, or two car-lengths, from the intersection when he first saw the van. He was driving 32–33 m.p.h. in what was a 30 m.p.h. zone. He had no time to honk the horn or to attempt to avoid the van. Upon impact, House was thrown from the jeep. He testified that he was "fuzzy" and that upon getting up he fell back down, but then climbed into his jeep.

Verhel was taken to the emergency room of St. Luke's Hospital. She was subsequently diagnosed as having a fractured right femur, numerous fractures of the pelvic area, and a partially collapsed lung.

She underwent surgery and was placed in traction at the hospital. In order that the bones heal properly, Verhel was allowed only to walk or lie down. After her release from the hospital on October 8, she continued traction at home for 10 more days. She returned to school on November 17. The cast was removed on December 3 or 4.

The case was tried before a six-member jury which found that each defendant was negligent, and that each defendant's negligence was a direct cause of Verhel's injury. The jurors apportioned the causal negligence as follows:

| | |
|---|---|
| Defendant School District No. 709 | 35% |
| Defendant Diane Williams | 0 |
| Defendant John Estes House | 26% |
| Defendant Karen Ann Pitoscia | 39% |
| Plaintiff Robin Verhel | 0 |
| Plaintiff Albert Verhel | 0 |
| | 100% |

The jurors found the damages to be $200,-200 to Robin Verhel and $14,000 to Albert Verhel. The trial court ordered judgment for plaintiffs against the school district, House, and the Pitoscias, jointly and severally, in those amounts. The trial court subsequently denied motions by the school district for JNOV or a new trial, by plaintiffs for an order making Williams jointly and severally liable for the judgment, by the Pitoscias to amend the order, and by House for a new trial.

The school district argues on appeal that it had no legal duty to supervise the cheerleaders with respect to the bannering activity; that the trial court erred in its instructions to the jury; that the damages found were excessive and unreasonable; and that the verdict was irreconcilably inconsistent.

Respondent Pitoscia cross-appeals, arguing that the damages were excessive and not justified by the evidence; that the trial court erred in allowing introduction of certain evidence regarding Pitoscia's driving behavior prior to the accident; and that the jury's special verdict was irreconcilable.

House, a respondent in the school district appeal, appealing in his own right, challenges the damages as excessive, the ver-

dict as inconsistent, and certain evidentiary rulings concerning his alcohol consumption as erroneous.

I. We address first the primary issue raised by the school district: whether the school district had a duty to supervise the cheerleaders with respect to the bannering activity under the facts and circumstances of this case. If the school district had no such duty, its motion for judgment notwithstanding the verdict must be granted. Where a school district has such a duty, that duty is to

> use ordinary care and to protect its students from injury resulting from the conduct of other students under circumstances where such conduct would reasonably have been foreseen and could have been prevented by the use of ordinary care. There is no requirement of constant supervision of all the movements of pupils at all times.

*Sheehan v. St. Peter's Catholic School,* 291 Minn. 1, 3, 188 N.W.2d 868, 870 (1971).

A school district is not relieved of liability because there was no prior notice of danger. *Raleigh v. Independent School District No. 625,* 275 N.W.2d 572, 575 (Minn.1978). A teacher, generally, is not required to anticipate the hundreds of unexpected student acts which occur daily or to guard against dangers inherent in rash student acts. *See, e.g. Morris v. Ortiz,* 103 Ariz. 119, 437 P.2d 652 (1968) (teacher and students in auto mechanics class were trying to bend severed automobile top, and one student jumped off bumper of car onto top). Recovery is allowed in Minnesota if the jury can find from the evidence "that supervision would probably have prevented the accident." *Sheehan,* 291 Minn. at 5, 188 N.W.2d at 871.

The Verhels, the school district, and Williams submitted requested instructions as to the school district's duty of care. The relevant instructions given by the trial court were:

> [T]he plaintiffs in this action, Robin Verhel and her father and natural guardian, Albert Verhel, claim that the defendant Independent School District No. 709 was negligent in the supervision of the Denfeld cheerleading squad on August 30, 1980 in failing to provide adequate supervision for the cheerleading squad while engaged in the bannering of the Denfeld football players' homes on the evening [sic] of August 30, 1980.
>
> \*     \*     \*     \*     \*     \*
>
> A school district has the duty to use ordinary care to provide regulations and supervision for students engaged in extracurricular activities so as to provide for their safety and welfare with respect to foreseeable hazards associated with such extracurricular activities.

The school district and Williams assert that this instruction was erroneous because it did not specify the limits on the school district's duty to supervise. The school district argues that, as a matter of law, it had no duty to supervise the bannering cheerleaders because the activity was not specifically approved or sponsored by the school district and took place off school premises, during summer vacation, on a weekend, in the early morning hours. If it were held liable under such circumstances, the school district says, it would be held liable for the safety of all students while in transit to or from a school activity. This is a misapprehension of the issue. The issue is not whether the school district is liable for the safety of all students while in transit to or from a school activity; clearly a school district is not so liable. A school district may be held liable, however, where it had undertaken to provide supervision. *See Law v. Newark Board of Education,* 175 N.J.Super. 26, 417 A.2d 560 (1980) (board provided supervision for recreational program using school playground). A school district's authority springs from its exercise or assumption of supervision and control over a student organization and its activities by appropriate agents of the school district. *Coates v. Tacoma School District No. 10,* 55 Wash.2d 392, 347 P.2d 1093 (1960); *Chappel v. Franklin Pierce School District,* 71 Wash.2d 17, 426 P.2d 471 (1967) (concerning extracurricular stu-

dent organization activity held away from the school grounds after school hours, school district defense of *ultra vires* rejected where school district had approved and encouraged student organization and had assumed control and supervision over organization and its activities). Where a school district has assumed control and supervision of all activities of a school club operated under its auspices, parents of participants have a right to rely upon that assumption. *Rupp v. Bryant,* 417 So.2d 658, 667 (Fla.1982).[2]

The issue is whether the school district had assumed control and supervision over cheerleading at Denfeld High School so as to have a duty to provide regulations and supervision for squad members while engaged in cheerleading activities and whether, on the facts of this case, bannering was such an activity.

The school district does not contend that the cheerleading squad was not a school-approved organization. It is clear from the record that the school district had assumed control and supervision over the cheerleading squad and its activities, including its transportation arrangements. The squad had a constitution which was approved by the school. The cheerleaders were governed by the constitution and by the Minnesota High School League rules which were administered by the school district. Squad members were "officially greeted" by the principal of Denfeld High School, Dr. Wayne Samskar, who told them of their importance to the school, its students, and its sports program. Samskar testified that cheerleading was a sanctioned activity of the school, one which he considered to be a co-curricular activity.[3] The school provided a paid supervisor for the squad, and supervising transportation arrangements was a part of the supervisory function. Both Samskar and Williams testified that they considered it their responsibility either to provide transportation or to approve the cheerleaders' transportation arrangements. Both testified that authority and control had been exerted in the past, including

2. There is some evidence that parents of participating cheerleaders in this case believed that the bannering was a school-sponsored activity. Robin Verhel's mother objected to the bannering, but Verhel told her mother that, as she and other cheerleaders believed it was, the activity was required. Karen Pitoscia's father gave his daughter permission to use the family's van in the middle of the night only after having been told she was asking to use it on behalf of the whole squad for the bannering activity.

3. Minn.Stat. § 123.38 (1982) provides in pertinent part:

Subd. 2. The board shall take charge of and control all co-curricular school activities of the teachers and children of the public schools in that district held in the school building or school grounds or under the supervision or direction of the school board and to that end adopt rules and regulations for the conduct of these activities in which the schools of the district or any class or pupils therein may participate.

\*    \*    \*    \*    \*    \*

Subd. 2a.  Co-curricular activities shall mean school sponsored and directed activities designed to provide opportunities for pupils to participate, on an individual or group basis, in school and public events for the improvement of skills.  Co-curricular activities are not offered for school credit, cannot be counted toward graduation and have one or more of the following characteristics:

(a) They are conducted at regular and uniform times during school hours, or at times established by school authorities;

(b) Although not offered for credit, they are directed or supervised by instructional staff in a learning environment similar to that found in courses offered for credit;

(c) They are partially funded by public moneys for general instructional purposes under direction and control of the board.

Subd. 2b.  The board may take charge of and control all extra curricular activities of the teachers and children of the public schools in the district.  Extra curricular activities shall mean all direct and personal services for public school pupils for their enjoyment that are managed and operated under the guidance of an adult or staff member.  Extra curricular activities have all of the following characteristics:

(a) They are not offered for school credit nor required for graduation;

(b) They are generally conducted outside school hours, or if partly during school hours, at times agreed by the participants, and approved by school authorities;

(c) The content of the activities is determined primarily by the pupil participants under the guidance of a staff member or other adult.

disallowing certain transportation arrangements.

■ There was also sufficient evidence on the record to find that the school district's responsibility continued during the summer months. The cheerleaders had established a summer schedule which required practice three mornings a week in June and July and five mornings a week in August. They drafted a constitution which required attendance at both practices and at other events. Samskar read and approved the constitution. The cheerleaders held fundraisers in the summer. They attended cheerleading camp. Williams kept in contact with the squad through the team captains. She visited some of the practice sessions and attended some of the weekly meetings. She signed purchase orders. The first football game of the season was scheduled for Saturday night, August 30, even though the regular school year would not begin until the following week. The bannering was done the morning of the day that both a schoolwide pep rally and the game were scheduled. Several cheerleaders testified that they considered their participation in the bannering mandatory. The cheerleaders made the posters inside the school building itself, using some school supplies and obtaining other supplies using the school's purchase order system. Under these circumstances, it is not unreasonable to hold that the school district's responsibility continued in the summer.

■ The questions of whether bannering was a recognized cheerleading activity and of whether Williams knew of the bannering plans were explored at length during the trial. There was evidence on the record from which the jury could have found that the practice of bannering the homes of student athletes before the first game of a season was a traditional, recognized activity of the cheerleading squad. There was also evidence that Williams knew bannering was a school tradition and that she had been involved the previous year in approving transportation arrangements when the hockey cheerleaders requested permission to banner the hockey players' homes. As to whether she knew of the football bannering plans, the following exchange occurred upon cross-examination of Williams:

Q You heard the girls mention at that meeting that they were going out and banner the football players' homes?

A Not that they were going out to banner. There was nothing concrete, they saying "We are going at this time." It was just, you know, a comment like "Hey, maybe we should, you know do something else or do this. There was nothing concrete there.

Q However you want to characterize it, Miss Williams, you heard the girls discussing the bannering activities, did you not?

A It wasn't a discussion. It was a comment.

Q Did you hear it?

A Yes, I did.

Q Did you hear it in your capacity as a supervisor for the team?

A Yes.

Q Did you make an inquiry about it?

A No, I did not.

Q Did you ask them what the transportation was going to be?

A There was nothing to inquire about.

     \*    \*    \*    \*    \*    \*

Q Did you ask them what the transportation arrangements would be?

A No, I did not.

     \*    \*    \*    \*    \*    \*

Q Now, you chose to disregard that comment, did you?

A Yes, I did.

Q If you hadn't disregarded it, you would have made the same inquiry that you made about the hockey player bannering, would you not?

A Yes, I would have.

It is clear from the record that the school district had assumed supervision and con-

trol over the cheerleading squad and its activities. Under the circumstances, the school district had a duty to supervise, by the exercise of reasonable care, the planning and conduct of the bannering activity of the cheerleaders, and we so hold.

The school district also had a duty to instruct properly and adequately the supervisor it assigned to the cheerleading squad. The instructions given were general and nonspecific. Williams was relatively young and inexperienced. She had no knowledge that the bannering activity was anything other than a traditional, school-approved activity nor did she have authority to alter school district policy permitting unsupervised driving by students with respect to intra-city extracurricular activities. She had also been given the message, by way of her contract, that supervision of the cheerleading squad during the summer months, while a good thing to do on her own time, was not considered by the school district to be required.

The school district could have exercised reasonable care in a variety of ways. It could have arranged for definite accountable supervision of the cheerleading squad during the summer months as it did for the football squad. It could have properly, adequately, and specifically instructed the assigned supervisor so that plans for the bannering and its attendant transportation would have been approved by the supervisor or principal or prohibited.

The school district contends that even if there was a duty to supervise, there was no breach of that duty as a matter of law because the accident as it occurred was not reasonably foreseeable or proximately caused by its negligent supervision. We have addressed in other cases the question of whether a risk of harm to students was foreseeable and avoidable by a school or its agents. In *Sheehan v. St. Peter's Catholic School*, 291 Minn. 1, 188 N.W.2d 868 (1971), a teacher escorted 20 eighth-grade female students to a playground during a school recess, instructed them to sit along the third-base line of the baseball field, and then re-entered the building. Several of the baseball players began throwing rocks at the girls. Despite various protests, the rock-throwing continued for 3 to 4 minutes. One of the girls was struck in an eye and lost sight in that eye. *Id.* at 2, 188 N.W.2d at 869–70. This court held "a jury could properly find that had the teacher been present she would have put a stop to this dangerous activity before plaintiff was struck." *Id.* at 5, 188 N.W.2d at 871. Notice of prior misconduct or the likelihood thereof was not required. *Id.* at 3, 188 N.W.2d at 870. In *Raleigh v. Independent School District No. 625*, 275 N.W.2d 572 (Minn.1978), a student was injured by another student while attending the film "KING" which was required of senior high school students by the St. Paul school system in observance of Afro-American History Week. The film contained scenes of racial violence. The evidence showed that there was substantial racial tension at Central High School. The plaintiff charged the school district with negligent supervision because 1,200 students were bused to the Orpheum Theater without directions which would provide for orderly entry and departure from the theater. Additionally, the school district had specified there be only one teacher present for every 35 students. Plaintiff testified that tension was high during the film and that racial slurs were exchanged between white and black students near her. As plaintiff and other students crowded out of the theater, her wrist was slashed with a knife and her purse stolen. *Id.* at 573–74. This court, in affirming the judgment for plaintiffs, concluded:

> [T]here was no error on the issue of negligent supervision or causation. By affirming the judgment for plaintiffs Cynthia Raleigh and her mother, we are not expanding the rule set forth in *Sheehan*. *Sheehan* requires that the school district exercise ordinary care to prevent foreseeable misconduct of other students. Thus, although the school district might not be liable for sudden, unanticipated misconduct of fellow students, it is liable for sudden, foreseeable misconduct

which probably could have been prevented by the exercise of ordinary care. The reason is that foreseeability creates a duty of ordinary care and proximate causation is established by showing the likelihood that the misconduct would have been prevented had the duty been discharged.

\* \* \* \* \* \*

The facts of this case make it extremely close. \* \* \* But, in view of the evidence indicating that the school district was aware of the racial tension and that there was a lack of supervision and organization of the students at the theatre, we cannot hold as a matter of law that the jury was unjustified in finding breach of duty. \* \* \*

*Id.* at 576.

▮ Here, as in *Raleigh,* there was a "lack of supervision and organization of the students" when the school district, through its agent, was aware of the risk of harm. The driving behavior of Pitoscia was foreseeable. Moreover, as in *Sheehan,* Pitoscia's misconduct would have been prevented had the school district's duty been discharged. Evidence was introduced that Pitoscia had been "driving kind of fast" and that she had driven over the curb shortly before the accident. Pitoscia herself admitted that she rolled through the stop sign. She also testified that she had played volleyball that day, worked at Hardy's that evening, was feeling tired at the time of the accident, and knew the cheerleaders still had half the houses to banner before 6 a.m. when they had planned to have breakfast. Had a supervisor or other approved adult been present, he or she would have intervened if Pitoscia were too tired or too pressured to drive safely. The district's argument that the conduct of Karen Pitoscia in failing to obey a stop sign and proceeding into an intersection without stopping was a superseding cause which precluded a finding of proximate cause is without merit. Such behavior, or misbehavior, by unsupervised students is to be expected and is precisely the harm to be guarded against by the exercise

of the school district's supervision. We cannot hold, as a matter of law, that the conduct of these unsupervised students or the accident as it occurred was not reasonably foreseeable nor that the school district's negligent failure to supervise was not the proximate cause of Verhel's injury. We conclude, as did the *Rupp* court, that, at best, these issues are for the finder of fact. We affirm the jury's finding that the school district was negligent and that that negligence was a direct cause of Robin Verhel's injury.

▮ 2. John House urges on appeal that, in view of the recognized prejudice held by the public against intoxicated drivers, it was error for the trial court to permit introduction of alcohol consumption without corresponding evidence of impairment or without instructing the jury to disregard the testimony. Where the evidence does not demonstrate that an automobile driver was intoxicated at the time of an accident, the decision as to whether an instruction to disregard testimony concerning alcohol consumption is given to the jury is within the sound discretion of the trial court. This court will not disturb the trial court's refusal to give such an instruction absent a showing of prejudice. *See Thole v. Noorlun,* 287 Minn. 52, 57, 177 N.W.2d 295, 298 (1970). The thrust of House's argument is that such evidence is necessarily inflammatory and prejudicial. This argument is not borne out by the jury's findings, however, where House was ascribed only 26% causal negligence while Karen Pitoscia was ascribed 39% and the school district 35%.

▮ House also argues that he should have been allowed (a) to introduce emergency hospital records which contained a statement by the examining physician that House "appeared alert and oriented" and (b) to testify that he was not given a blood alcohol test. The trial court refused to allow the examining doctor's comments on the question of whether House was impaired at the time of the accident because of his alcohol consumption. The trial court's apparent concern was that the

doctor's observation may have been made in looking for a possible head injury: "[T]here is an internal lack of foundation here because we don't know that he was ever even looked at for consumption of alcohol." The trial court is accorded wide discretion in making its evidentiary rulings. Thus, we find no error.

■ 3. In pretrial conference, Pitoscia brought a motion *in limine* that any testimony regarding her driving not be allowed. Several attorneys opposed the motion, arguing that evidence of erratic driving was relevant as to the school district's duty to inquire about transportation arrangements. They also argued that it had bearing on the question of each girl's comparative negligence; for example, in not protesting about Pitoscia's driving or in not getting out of the van. The trial court allowed this testimony but gave the following instruction: "I instruct you that any evidence of Karen Pitoscia's driving remote in time from the accident should not be considered in determining her fault, if any." He continued, "A passenger has a duty to take active measures to protect itself from danger only when it is apparent to them that they can no longer rely on the driver for their protection * * *." We find no error.

■ 4. The school district, Pitoscia and House claim that the award of $200,-200 to Robin Verhel and of $14,000 to her father was excessive and unreasonable in light of the injuries and damages suffered. The test for setting aside a verdict as excessive is whether it shocks the conscience. *DeWitt v. Schuhbauer*, 287 Minn. 279, 286, 177 N.W.2d 790, 795 (1970). Beyond evidence dealing with what Verhel experienced in emergency care and in the hospital, there was substantial testimony from both Verhel and her treating physician, Dr. Carlson, which supports the jury's award. Using a pelvic bone structure model, Dr. Carlson, an orthopedic surgeon, explained that Verhel's fractured pelvis was a type of injury not corrected surgically except in extreme cases. In his medical-legal evaluation he assigned 0% permanent partial impairment and described the pelvic fracture

as healed. Nevertheless, he also testified that, because Verhel had disruption of two of the three major points of her pelvis, she would be predisposed to certain medical problems. Those medical problems are low back pain, difficulty during childbirth and arthritic-type conditions. As to Verhel's right leg, it had been necessary to surgically realign the leg bones and to insert a long Steinman pin completely through her lower leg to serve as an anchor during traction. Although Dr. Carlson was able to later describe Verhel's walk as grossly normal, he assigned an 8% permanent partial impairment to her right leg and testified that, with activity, her leg would fatigue easily. Pictures were introduced to show that Verhel could not cross her right leg over her left leg. Verhel testified that she was unable to perform physical activities as well as she could before the collision and that her leg began to ache whenever she stood for more than an hour. To relieve the pain, it was and continues to be necessary for her to lie down or to have someone massage her leg. And finally, Verhel testified that her grades had fallen as a result of the accident. As to the $14,000 award to the father, the parties stipulated to over $9,500 in medical and hospital expenses. The trial court stated in its memorandum accompanying its denial of appellants' motions for a new trial or JNOV:

> While the damages found by the jury were generous, the Court feels that there was sufficient evidence to sustain said damages. The Court feels here that there was no misconduct on the jury's part but they as a finder of fact have made their determination, and the Court at this time is unwilling to set this aside.

In *Schindele v. Ulrich*, 268 N.W.2d 547 (Minn.1978), this court considered whether damages of $227,000 were excessive. The 27 year old plaintiff, injured in a truck rollover, suffered a severe injury to his right hand, aggravation of a previous knee injury, plus general cuts and bruises. This court affirmed the jury's determination as follows:

The final issue raised concerns the jury's assessment of plaintiff's damages as $227,000. [Appellant] argues that the damages are excessive as a matter of law. While the amount of damages is large relative to the severity of plaintiff's injuries, the assessment of damages is the peculiar province of the jury. The trial court upheld the damages verdict because of plaintiff's age (he was 27 years old at the time of the accident), the prolonged pain he suffered, and the impairment of his earning capacity. We do not find sufficient grounds to conclude that the damages found by the jury are excessive as a matter of law.

*Id.* at 552. In view of Verhel's young age and active life-style, the recurring pain in her leg, her reduced ability to stand for long periods of time or to engage in active physical efforts, and the disruption of her education, we do not find the amounts awarded excessive as a matter of law.

5. Lastly we address the issue of whether the jury's verdict is irreconcilable. The jury found that all of the defendants were negligent and that the negligence of each was a direct cause of Robin Verhel's injuries but apportioned no percentage of causal negligence to Diane Williams. The Verhels urge this court to hold Williams jointly and severally liable for 35% of the award along with the school district. The school district, the Pitoscias and House request a new trial. Williams argues that to do either would be to ignore both the jury's stated intent that only the school district was liable and the trial court's stated determination that the judgment reflected the jury's intent. This court has long held that a verdict is to be liberally construed to give effect to the intention of the jury and to harmonize answers to interrogatories if it is possible to do so. The test is whether the answers can be reconciled in any reasonable manner consistent with the evidence, and its fair inferences. *Bellon v. Klawitter,* 323 N.W.2d 735, 736 (Minn.1982), citing *Reese v. Henke,*

277 Minn. 151, 155, 152 N.W.2d 63, 66 (1967). We must view the verdict, however, not only in the context of the testimony but in light of the instructions of the court as well. *Reese,* 277 Minn. at 154, 152 N.W.2d at 65. The manner in which the case is submitted becomes the law of the case and may not be challenged for the first time on appeal. *Bakke v. Rainbow Club, Inc.,* 306 Minn. 99, 102–103, 235 N.W.2d 375, 378 (1975). Plaintiffs in their complaint alleged that at all times Williams, as a teacher and cheerleading moderator, was working within the scope of her employment as an employee of the school district. Whatever duty of care Williams had with regard to supervision of the cheerleaders existed because of her employee status. The court in its instructions to the jury set out the claim of the plaintiffs that the school district, with no mention of Williams, was negligent in supervising the cheerleading squad and its bannering activity. The court further instructed the jury only as to the duty of the school district to use ordinary care to provide regulations and supervision for students engaged in extracurricular activities. No separate instruction as to a separate duty of Williams to provide supervision was requested or given. No instructions were requested or given on behalf of employee Williams that the school district had a duty to give her adequate and proper instructions as to the proper supervision of the cheerleading squad and its activities and that failure to give such instructions might result in liability of the school district alone if its negligence in failing to give adequate and proper instructions as to supervision was a direct cause of the plaintiff's injuries.[4] *See, Gamble-Skogmo, Inc. v. St. Paul Mercury Indemnity Co.,* 242 Minn. 91, 95 n. 3, 64 N.W.2d 380, 384 n. 2 (1954) (under instructions given, the jury determined that the cause of the accident was failure on part of employer to give adequate and proper instructions to employee

---

**4.** Counsel for the school district represented both the school district and Williams through May 28, 1982, when the trial court entered judg-

ment exonerating Williams. At that point, separate counsel represented Williams for purposes of post-trial motions and this appeal.

as to the proper and reasonably safe way in which to assemble the swather hitch and tilting bar and that, as a consequence, the employee himself was not guilty of any negligence at the time and place of the happening of the accident). Even without such an instruction the jury could have found, on the evidence before it, that the school district knew of and did not disapprove of bannering as a traditional cheerleading activity, that the school district permitted unsupervised driving by students with respect to intra-city extracurricular activities, and that whatever negligence was Williams' for failing to inquire further of exact details of the bannering activity, the liability, as the jury through its foreman adamantly maintained, was on the school district alone. The trial court, on speaking personally to the jury foreman and on reviewing the foreman's comments on the record, determined that the jury's intent was reflected in the court's order for judgment, finding, in effect, that further deliberation was unnecessary. Under the facts of this case, including the instructions as requested and given, we hold the verdict to be reconcilable. The trial court properly denied all post-trial motions.

Affirmed.

SIMONETT, Justice (dissenting in part).

I would grant a new trial on liability only because of the perverse verdict and, therefore, to this extent, I respectfully dissent from the majority opinion.

The 12 girls in the cheerleading squad decided on their own initiative to banner. Karen Pitoscia, 17, the driver, first knew she was to drive at 10 p.m. Friday night, August 29. She borrowed her parents' van with permission. The record does not disclose what she told her parents. Karen began picking up the other girls between 1 and 2 a.m. Robin Verhel, the plaintiff, age 16, was picked up at her home at 2 a.m. Robin said her mother did not like her going, "but I told her I had to go because all the other cheerleaders were going." She also told her mother that Karen Pitoscia might be driving, but she was not sure.

The girls intended to stay out all night, driving to some 60 homes in the City of Duluth, concluding with a 6 a.m. breakfast. As they went on their way, the group of girls in the van were singing and, as Robin put it, "just goofing off." The accident happened at 5 a.m. This is the kind of activity that one might reasonably foresee could lead to an auto accident.

I would phrase the main issue: Did the school district assume control and supervision over the bannering activities of the cheerleaders during their all-night excursion of August 29–30, 1980? There are two subissues: To what extent, if any, was bannering a part of the cheerleading program? And did the school district know the girls were planning to banner on the night in question?

While plaintiffs referred to bannering as a "tradition" at Denfeld High, the trial record suggests it was at best a sporadic, but acceptable, activity. Clearly, however, bannering, unlike a scheduled football game, was an optional activity, not required as part of the cheerleading program but something the girls—who had a great deal of discretion—might, impromptu, on their own initiative, decide to do. If the girls decided to banner, the squad captains were expected to discuss the proposed activity with their advisor. In this kind of situation, the school district's duty to supervise the bannering would not arise until it knew or should have known that the bannering was going to take place. Ordinarily, a school district's duty to supervise is based on the fact that parents have relinquished custody of their children to the school for school activities and, consequently, the school is charged with the duty of protecting the children while in its charge. *See Pratt v. Robinson*, 39 N.Y.2d 554, 384 N.Y.S.2d 749, 349 N.E.2d 849 (1976); Restatement (Second) of Torts, § 320, comment (b) (1965). Here, unless the school knew or had reason to know otherwise, it had a right to assume the children were in their parents' custody and under their supervision that summer weekend.

If Diane Williams knew or should have known that the girls would be bannering that night, the school had a duty to take reasonable measures that the activity would be done in a reasonably safe manner or not done at all. Nobody disagrees with this proposition. Ms. Williams and Dr. Samskar, the principal, both testified forthrightly that they would have taken protective measures if they had known about the girls' plans. It is also clear that the school district would be charged with whatever notice its employee Williams had.

Consequently, the nature and extent of Diane Williams' knowledge was critical, and the evidence on this issue was sharply contested. The jury found Williams negligent and her negligence a direct cause of plaintiff's injuries. Presumably, the jury found that Diane Williams knew about the bannering and failed to do anything about it. Indeed, the jury foreman said as much to the clerk in a colloquy when the verdict was submitted. But then, in apportioning the causal negligence of the parties, the jury found just the opposite. It found no negligence on the part of Williams contributed to cause the accident. If this means, as it might, that Williams did not know about the bannering, then to the extent that Williams and the school district were found negligent for failure to supervise the activities on the Friday night involved, the verdict was perverse. Plaintiffs suggest the jury may have felt that Williams knew about the bannering plans but excused her because she had not been properly instructed by the school district. This, however, overlooks the fact that Williams testified she would have acted, even without further school district instructions, if she had known of the bannering.

The jury may have been misled by another aspect of this case. It is always a problem how to submit the comparative fault question to the jury when a corporation and its employee are both defendants and both are claimed to be negligent in their own right and the corporation is acting, at least in part, through the defendant employee. Here the school district could have been negligent, independent of any conduct of Williams, as for example, by failing to promulgate appropriate cheerleading regulations or by failing to instruct adequately its employee Williams on her cheerleading duties. At the same time, Williams could be negligent, if on notice, in failing to supervise the bannering that occurred, and, since her conduct is the conduct of the school district, the school district would also be negligent for failing to supervise the specific bannering activity. The jury might have felt that the 35% causal negligence it put on the school district included Williams' negligence and, therefore, that assigning any more negligence to Williams would be superfluous. Apparently it is on this theory that plaintiffs ask that we change the jury's verdict to hold Williams and the school district jointly liable for 35% causal negligence, although this assumes that the jury found no negligence on the part of the school district independent of Williams' own negligence—a point on which Williams might disagree.[1]

In any event, it seems to me that to reconcile the perverse verdict on this record would be an exercise in guesswork, and that the proper solution must be a new trial on liability only for all parties.

It can be argued—and, indeed, was argued unsuccessfully to the jury—that supervisory responsibility rested not with the school district but with the parents. There was, however, little testimony on this issue. No parent testified that their child was allowed to go bannering after midnight in reliance on any representation that the child was at a supervised school activity. Nevertheless, the issue here is not only a

---

1. Perhaps the jury might be instructed to keep the negligence of the corporation and its employee separate, and the court, after the verdict comes in, then adds the employee's percentage of negligence to that of the corporation's to arrive at the corporation's total causal negligence. Or only the corporation's negligence is included in the comparative negligence question and the jury is then given a second comparative negligence question asking the jury to state what percentage of the corporation's causal negligence is to be allocated to the employee.

parent's responsibility, but the school district's, and it cannot be said that as a matter of law sole supervisory responsibility rests with the parents. On the other hand, it would be unfortunate and incorrect if this case were construed to impose some ill-defined supervisory duty on school districts over all aspects of extracurricular activities. If this were true, prudent school administrators, with limited resources, would tend to curtail worthwhile extracurricular programs. What distinguishes this case, I think, is there was evidence that bannering was an acceptable school activity; that the bannering involved use of a motor vehicle under circumstances that might reasonably be foreseen to present the hazard of an auto accident; and that the accident occurred during performance of the school activity itself.

PETERSON, Justice (dissenting).
I join in the dissent of Justice Simonett.

KELLEY, Justice (dissenting).
I join in the dissent of Justice Simonett.

COYNE, Justice (dissenting).
I join in the dissent of Justice Simonett.