Theresa DAVIS, et al., Appellants,

v.

**LUTHERAN SOUTH HIGH SCHOOL ASSOCIATION OF ST. LOUIS,** et al., Respondents.

No. ED 86449.

Missouri Court of Appeals, Eastern District, Division Three.

June 27, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 9, 2006.

Steven Michael Dioneda, Attorney, St. Louis, MO, for appellant.

Robert Joseph Wulff, Attorney, St. Louis, MO, for respondent.

BOOKER T. SHAW, Judge.

Theresa Davis and Rich Davis (collectively, "Parents") appeal from the trial court's grant of summary judgment to Lutheran South High School Association of St. Louis ("Lutheran South"), Paul Buetow, Daniel Harms, and Kenneth Bauer (collectively, "School"). In Parents' sole point on appeal, they argue the trial court erred in granting summary judgment by ruling that the School did not have a duty of care to provide school bus transportation or otherwise directly supervise the transportation for student spectators attending the girls' softball championship game in Columbia, Missouri. We affirm.

### Standard of Review

"When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered." *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Our review is essentially *de novo. Id.* The trial court's ruling will be upheld if no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. Rule 74.04(c). In order for the School to be entitled to summary judgment, it had to establish one of the following:

(1) facts that negate any one of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements, or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense.

*ITT Commercial Fin. Corp.*, 854 S.W.2d at 381.

### Facts and Procedural History

The facts in the light most favorable to Parents are as follows: Parents' son, Lee Michael Davis ("Son"), was a student at Lutheran South. He was killed in a car-tractor trailer collision while traveling to Lutheran South's championship softball game ("Game") in Columbia, Missouri on October 19, 2001. Two other students in the car were also killed.

Prior to the accident, the School announced on Wednesday, October 17, that the girls' softball team had qualified to play in the state championship game to be held that Friday afternoon, October 19, in Columbia, Missouri. The School also announced that (1) the students would be given an excused absence for attending the Game, meaning that full credit for a day's worth of classes would be given to the students;[1] (2) the students had to bring in a permission slip indicating their parents' permission to attend; (3) classes would be held on Friday for those not attending the Game; (4) the students had to provide their own means of transportation to the Game; and (5) once at the Game, the students had to sign in and out with a faculty member.[2] The record reveals that the School had no means to prevent a

---

1. Receiving an excused absence was significant in that students who received an unexcused absence may receive detentions, a suspension and/or could not participate in any extra-curricular activity that students were involved in at Lutheran South.

2. There is no dispute that faculty members were present at the Game to supervise the students and to verify attendance and departure from the Game.

student from attending the Game without a permission slip.

The School gave students directions to the Game. The School did not send parents any information regarding these announcements, thereby leaving communication regarding the particulars of the event to the individual student. The members of the softball team were provided bus transportation.

The morning of the Game, Ms. Davis took her youngest son to school. Upon returning home, she was surprised to see Son still at home because he normally would have been at Lutheran South. Son was given access to a car when he turned sixteen and regularly drove himself to and from Lutheran South. Upon questioning, he told her that he had driving school that morning.[3] She noted that his driving school was the following day, not Friday. Son then left home without mentioning the Game. Ms. Davis assumed Son left to attend regularly scheduled classes at Lutheran South.

Son did arrive at Lutheran South premises briefly to meet with a fellow student, Brian Miller ("Miller"). Son then entered Miller's car. Miller, the driver, and Son drove to the home of Amanda Truss ("Truss").[4] There, Truss, Timothy Stephens and Alexis Langenbach[5] got into the car with Miller and Son. The students then proceeded to a fast food restaurant for breakfast where they also met with other students. From the fast food restaurant these students proceeded to drive along Interstate 70 toward Columbia. The students intended to caravan in three cars to Columbia. The record reveals that all three drivers were driving at a rate of speed in excess of 85 m.p.h., racing with each other, and getting on and off the highway. Additionally, items were being thrown out of one car in order to strike another car. At one point, Miller had to pull over because a chocolate shake was thrown onto his car by a passenger of another car. Ultimately, Miller lost control of his car and crossed the median, colliding with a tractor trailer. Miller and Son were pronounced dead at the scene. Truss died in the hospital that day. Stephens and Langenbach were seriously injured.

Parents filed a wrongful death lawsuit against the School on the theory of negligent supervision and/or failure to supervise. The trial court granted the School's summary judgment motion ruling that the School did not owe a legal duty to supervise Son traveling to Columbia or to provide school bus transportation and therefore, as a matter of law, the School was entitled to summary judgment. This appeal follows.

### Analysis

▉ To successfully prove the tort of negligent supervision, a plaintiff must plead and prove the following: (1) a legal duty on the part of the defendant to use ordinary care to protect the plaintiff against unreasonable risks of harm; (2) a breach of that duty; (3) a proximate cause between the breach and the resulting inju-

---

3. Son had previously received a speeding ticket and was ordered to attend driving school.

4. Amanda Truss's parents gave her permission to attend the Game. The record reveals her parents knew she would be driving with a student of Lutheran South. Her parents filed a wrongful death suit against the School in a separate action. The School was also granted summary judgment in that suit and Truss's parents appealed. The opinion in that case is being handed down simultaneously with this opinion.

5. Alexis Langenbach was not a student at Lutheran South.

ry; and (4) actual damages to the plaintiff's person or property. *Hoover's Dairy, Inc. v. Mid–Am. Dairymen, Inc.*, 700 S.W.2d 426, 431 (Mo. banc 1985). "An often misunderstood aspect of the doctrine of negligent supervision and which when ignored often leads to confusing analysis is that the 'duty to supervise runs not to an activity, but rather to an individual.'" *O.L. v. R.L.*, 62 S.W.3d 469, 474 (Mo.App. W.D.2001) (quoting *Bequette v. Buff*, 862 S.W.2d 921, 924 (Mo.App. E.D.1993)). "With regard to negligent supervision of a child, the gravamen of the cause is the supervisor's obligation and ability to control the child and not the supervisor's control over the instrumentality (whether human, mechanical or other) which causes the harm." *Id.*

Parents have to prove that a duty existed between the School and Son while Son was traveling to Columbia. This Court has previously found that the acceptance of custody and control of a minor is one relationship that will give rise to a duty of care. *See Hill ex rel. Hill v. Herbert Hoover Boys Club*, 990 S.W.2d 19, 22 (Mo. App. E.D.1999); *A.R.H. v. W.H.S.*, 876 S.W.2d 687, 691 (Mo.App. E.D.1994). Further, we have recognized that a school and its teachers have a duty to supervise the students under their custody and control. *See Smith v. Archbishop of St. Louis*, 632 S.W.2d 516, 521–22 (Mo.App. E.D.1982) (noting that a school is not required to maintain a constant vigil over every student within eyesight, but the duty to a child requires more vigilance and caution than might the exercise of ordinary care where adults are concerned).

▌ The issue before this Court is whether a school owes a duty of care to its students when they are en route to an off-campus school activity and not in the physical custody and control of the school. The existence of a duty is a question of law for the court to determine. *Stitt v. Raytown Sports Association*, 961 S.W.2d 927, 931 (Mo.App. W.D.1998).

This is a case of first impression in Missouri. However, other jurisdictions have addressed this issue. In accord with those jurisdictions, we find that when a school does not have physical control or custody of its students, the school does not owe a general duty of care to those students.

A case relied upon by many jurisdictions in similar cases and one that is on point here, is *Pratt v. Robinson*, 39 N.Y.2d 554, 384 N.Y.S.2d 749, 349 N.E.2d 849 (N.Y. 1976). In *Pratt*, parents of a seven-year-old student brought an action against their school district for injuries sustained by their daughter who was struck by a truck while crossing the street several blocks from where she had been discharged from the school bus. *Id.* The theory of parents' action was that the location of the school bus stop was negligently planned; that the stop should have been located at a place so that crossing a street was not necessary. *Id.* at 850.

The court in *Pratt* first analyzed whether a duty existed to transport the student to a location where she did not have to cross the street. *Id.* It found there was no statutory duty imposed upon the school to bus any child. *Id.* It further found that the common-law custodial duty of a school toward its students did not supply any basis for liability. *Id.* Relying on the Restatement (Second) of Torts sections 320 and 315, subd. (b), the court stated "this special duty owed to students requires a school to act when a child, *while in its charge*, is threatened by the negligence of a third party, and it must make reasonable efforts to anticipate such threats." *Id.* (emphasis added). The court also stated:

the duty owed by a school to its students, however, stems from the fact of

its physical custody over them.... The school's duty is thus coextensive with and concomitant to its physical custody of and control over the child. When that custody ceases because the child has passed *out of the orbit of its authority* in such a way that the parent is perfectly free to reassume control over the child's protection, the school's custodial duty also ceases.

*Id.* at 853 (emphasis added) (internal citations omitted). Using this reasoning, the court held that the school extended its control over its students from the school door to the bus stop only. *Id.* At that point, the student is discharged to a safe spot where parental control could be reassumed and the school's duty ceased. *Id.* The court saw no basis for the creation of a school's duty to protect its students from hazards which they encounter once they are on their way home and outside the control of the school. *Id.* at 854.

Likewise, in *Young v. Salt Lake City School District*, 52 P.3d 1230 (Utah 2002), a car struck a child while he was riding his bike to a mandatory parent-teacher-child conference after school hours. *Id.* at 1231. The trial court granted the school summary judgment. *Id.* The Supreme Court of Utah affirmed the grant of summary judgment, noting that the school did not have custody over the student at the time of the injury and therefore, no duty existed. *Id.* at 1233. The court, following *Pratt*, held that when a school lacks custody of a student it has no protective obligation and no duty exists. *Id.* In determining whether the student was in the school's custody, the court looked to the following facts: (1) school had adjourned for the day and the student had been released into the care of his parents; (2) injury did not occur on

school premises or within the school's control; and (3) at the time of the injury the student "was not participating in a curricular or extra-curricular school sponsored event; he was simply *in the process of traveling* to the event." *Id.* at 1234 (emphasis in original).

Similarly, in *Norton v. Canandaigua City School District et al.*, 208 A.D.2d 282, 624 N.Y.S.2d 695 (N.Y.App.Div.1995), a parent sued school after his ten-year-old daughter was struck by a car crossing a street on the way to her bus stop. *Id.* at 283, 624 N.Y.S.2d 695. The child arrived at the bus stop ten minutes prior to the bus's scheduled arrival time. *Id.* The parent alleged that the school failed to instruct her how to safely cross the street, but instructed the student to be ready and waiting at the bus stop when the bus arrived.[6] *Id.* The school argued that it did not owe a duty to the student because it was not able to control the conduct of the child before the school bus arrived. *Id.* at 284, 624 N.Y.S.2d 695. The trial court granted school's request for summary judgment. *Id.* The court of appeals affirmed the grant of summary judgment, again relying on *Pratt*, and stating further that "a school district's duty to a student, unlike a parent's duty to a child, is strictly limited by time and space." *Id.* at 285, 624 N.Y.S.2d 695. The court noted that "in short, the [school] had not assumed control over [student] at the time of the accident. Whether a student should cross the street to wait for the school bus to arrive or wait to cross until the bus arrives is a decision for a student or parent to make, not a school." *Id.* at 287, 624 N.Y.S.2d 695.

In a more recent New York case analogous to ours, a seventeen-year-old high school student, Christopher Ramo, sus-

6. This case also involved a New York statute, not relevant to this appeal or the analysis applied therein, whereby bus drivers were instructed to wait to depart from the bus stop until exiting students crossed the street safely.

tained serious injury when he was involved in a car accident. *Ramo v. Serrano,* 301 A.D.2d 640, 754 N.Y.S.2d 336 (N.Y.App. Div.2003). At the time of the accident, Ramo was driving his car to a bowling alley where his first class of the day was scheduled to begin at 8:20. *Id.* at 641, 754 N.Y.S.2d 336. Ramo was not required to report to the school before going to the bowling class, but rather attendance was taken at the bowling alley. *Id.* The court of appeals reversed the lower court's denial of summary judgment in favor of the school. *Id.* Relying upon *Pratt* and *Norton,* the court held that Ramo was not in the custody and control of the high school because the accident occurred before school began. *Id.* Accordingly, the school did not owe a duty to Ramo. *Id.*

The analysis and holdings of the aforementioned cases, while not binding upon this Court, are persuasive. Here, we must look to whether the School had physical custody and control of Son to determine whether the School owed him a duty under the circumstances.[7]

Son drove to Lutheran South the morning of the Game to meet Miller. However, it is clear from the record that students were not required to arrive at Lutheran South prior to traveling to Columbia. Miller then drove with Son to Truss's home to pick up another student and a teenager, who was not a student of Lutheran South. The students then proceeded to a fast food restaurant. These detours demonstrate the School's lack of control and authority over Son's driving, his transportation to

the Game and his whereabouts on the morning of the Game.

Also, attendance at the Game was not mandatory. Although the School encouraged its students to attend the Game, regularly scheduled classes were being held at Lutheran South. Similar to *Ramo,* attendance for those attending the Game was taken once the students arrived at the Game. This is when the school day officially started for those students and when the School's duty of care to those students began. Put another way, once the students arrived at the Game in Columbia and checked-in with the faculty members, the transfer of custody from the parents to the School occurred and the students were then in the custody and control of the School. Finally, the injury did not occur at Lutheran South, but rather the injuries were sustained on a highway while traveling to the Game.

The morning of Son's accident was no different than any other given day when a student drives himself to school. In fact, here, the record reveals that Son drove himself, with his Parents' permission, to Lutheran South on a regular basis. A school has no control over a student's mode of travel to and from school when it does not undertake to provide transportation to and from school for its students. *See O.L.,* 62 S.W.3d at 474 (referring to the supervisor's obligation to control the child and not over the instrumentality causing the harm); *Stitt,* 961 S.W.2d at 931(noting that in order to impose a duty on a defendant organization to protect its members against unreasonable and fore-

7. Our analysis, here, however, does not foreclose the possible extension of a school's duty to its students beyond a "safe spot" when school bus transportation to and from school is provided in the normal course of the school's operation. *See generally, Plummer v. Dace,* 818 S.W.2d 317, 321 (Mo.App. E.D. 1991) (holding that although school was appropriately dismissed due to sovereign immunity on the arguments asserted by plaintiff, summary judgment was not appropriate for bus driver where reasonable minds could differ as to whether he provided a six-year-old student with a safe spot to alight even though she was in a position of safety once the bus driver drove away).

seeable dangers associated with an activity [such as driving], the activity must be under the organization's control); *Collette v. Tolleson Unified School District,* 203 Ariz. 359, 54 P.3d 828, 832–33 (2003) (stating that a duty would not be imposed upon a school as to its student's conduct when (i) it had no personal control over student's actual operation of his vehicle; (ii) it has no power to decide which students are authorized to drive; and (iii) it has no power to prevent or restrict a student's off-campus driving privileges). Here, the School merely provided an opportunity for the students to attend the Game without penalty of losing credit for a day's worth of classes in order to support the girls' softball team. We find the School did not have physical custody or control of the Son on the morning of the accident. Therefore, the School owed Son no duty of care under these circumstances. The trial court's grant of summary judgment in favor of the School is affirmed.[8]

AFFIRMED.

KATHIANNE KNAUP CRANE, P.J., and LAWRENCE E. MOONEY J., Concur.

---

8. Parents direct this Court to *Whittington v. Sowela Technical Institute,* 438 So.2d 236 (La. Ct.App.1983). In *Whittington,* an adult nursing student was killed in a vehicle accident in transit to a mandatory field trip whereby transportation was provided and controlled by the school. The Louisiana Court of Appeals held that school had a duty to provide transportation to its students under safe conditions when attending school activities. *Id.* at 247. We do not find this case helpful to Parents because in that case the school had custody and control of the students. *Id.* 245–

47. Parents also rely upon *Verhel v. Independent School District No. 709,* 359 N.W.2d 579 (Minn.1984). The facts of this case are also distinguishable from the case at bar. In *Verhel,* a cheerleader was injured in a car accident while participating in a cheerleading event. *Id.* at 583–85. There the court found that the school had custody and control over the cheerleading organization, an extra-curricular organization. *Id.* at 589. Further, the school undertook to supervise the cheerleaders and to provide transportation to cheerleading events. *Id.*