John WILSON and Esther Wilson, individuals, and John Wilson and Esther Wilson as Guardians for Karleen Hilda Kilgrow, Ronald Leon Kilgrow, Jr., and Ren Pascal Kilgrow, Plaintiffs and Appellants,

v.

**VALLEY MENTAL HEALTH,**
Defendant and Appellee.

No. 970308.

Supreme Court of Utah.

Oct. 6, 1998.

James C. Haskins, Salt Lake City, for plaintiffs.

Kendall P. Hatch, Kevin D. Swenson, Salt Lake City, for defendant.

ZIMMERMAN, Justice:

This case is before us on appeal from a grant of summary judgment in favor of defendant Valley Mental Health. Plaintiffs John and Esther Wilson argue that the trial court erred in ruling that under section 78–14a–102(1) of the Code, Valley Mental Health had no duty to protect their daughter, Jayleen Kilgrow, or their grandchildren from the

conduct of Ronnie Kilgrow, Jayleen's ex-husband and the children's father. Ronnie Kilgrow had been brought to Valley Mental Health by a police officer for treatment and was released. Later that same day he strangled Jayleen and attempted to strangle one of their children. We affirm.

[redacted] We set forth the facts before turning to the standard of review and our analysis. In doing so, we note that when "reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Higgins v. Salt Lake County,* 855 P.2d 231, 233 (Utah 1993).

On July 1, 1991, Ronnie Leon Kilgrow ("Kilgrow"), who had been receiving treatment for schizophrenia from Valley Mental Health since October of 1990, strangled his ex-wife Jayleen and attempted to strangle one of his children.[1] Earlier that day, a Utah Highway Patrol officer brought Kilgrow to Valley Mental Health after Kilgrow approached the officer and asked for the officer's gun so that he could protect himself from the people following him. The officer telephoned Valley Mental Health and, at their request, drove Kilgrow to their facility. The officer left the keys to Kilgrow's truck with an employee of the facility. Kilgrow had an interview lasting approximately thirty minutes with Laraine Anderson, a registered nurse. Anderson's treatment of Kilgrow was overseen by Dr. Karen Black, a licensed psychiatrist. After Kilgrow's interview with Anderson, it was determined that Kilgrow was not a threat and he was permitted to leave. Although the prescribed dosage of his medication was increased as a result of the visit, no medication was directly administered to Kilgrow, nor was he actually seen by Dr. Black.

Upon leaving Valley Mental Health, Kilgrow proceeded to his ex-wife's house, strangled her, and attempted to strangle his son. He then went to his own home, climbed onto the roof of the house and jumped off, knocking himself unconscious. After regaining consciousness, he again climbed onto the roof, but paramedics persuaded him to come down. He thereafter confessed to having killed Jayleen.

For approximately two weeks preceding the incident, Kilgrow had been experiencing hallucinations and was apparently decompensating as a result of a reduction in the dosage of his antipsychotic medications. In the days immediately preceding the incident he had shown increasing levels of paranoia and had become convinced that a "sky bomb" was following him. According to a psychiatric evaluation conducted after his arrest, in killing his ex-wife and attempting to strangle his son, Kilgrow was attempting to save them from suffering the effects of the sky bomb's heat and fire.

Charges were filed against Kilgrow on July 5, 1991, but he was determined to be incompetent to stand trial and was committed to the Utah State Hospital for treatment. On January 4, 1993, after being found competent to stand trial, Kilgrow pleaded "guilty and mentally ill" to manslaughter and aggravated assault. Kilgrow was sentenced to concurrent prison terms of 1 to 15 years and 0 to 5 years and was committed to the Utah State Hospital.

On February 29, 1996, the Wilsons filed their complaint in this case, alleging that Valley Mental Health breached its duty by not properly treating Kilgrow. On January 28, 1997, Valley Mental Health moved for summary judgment on the ground that under section 78–14a–102(1) of the Code, it had no duty to Jayleen and her children and, therefore, the Wilsons could not prove an essential element of their negligence claim. Valley Mental Health also asserted that even if it did have a duty, the statute of limitations had run, barring the Wilsons' claim. The trial court granted summary judgment on the duty issue and did not address the statute of limitations argument.

[redacted] Turning to our analysis, we first state the standard of review. "Summary judgment is appropriate only when no genuine issue of material fact exists and the mov-

1. According to the complaint, the child was of Jayleen and Ronnie. However, evidence in the record shows that the child was in fact fathered by another man. Nonetheless, we state the facts as they are pleaded.

ing party is entitled to judgment as a matter of law." *Higgins,* 855 P.2d at 235. Because the question of whether summary judgment is appropriate is a question of law, we accord no deference to the trial court. *See id.* Furthermore, "we may affirm a grant of summary judgment on any ground available to the trial court, even if it is one not relied on below." *Id.*

Although the district court did not state why it concluded there was no duty, we assume it based its decision on the sole ground urged by Valley Mental Health— section 78–14a–102(1) of the Code. That section states:

> A therapist has no duty to warn or take precautions to provide protection from any violent behavior of his client or patient, *except when that client or patient communicated to the therapist an actual threat of physical violence against a clearly identified or reasonably identifiable victim.* That duty shall be discharged if the therapist makes reasonable efforts to communicate the threat to the victim, and notifies a law enforcement officer or agency of the threat.

Utah Code Ann. § 78–14a–102(1) (1996) (emphasis added). Section 78–14a–101 sets forth the definition of a therapist. It states:

> As used in the chapter, "therapist" means:
>
> (1) a psychiatrist licensed to practice medicine under Section 58–67–301, Utah Medical Practice Act or under Section 58–68–301, Utah Osteopathic Medical Practice Act;
>
> (2) a psychologist licensed to practice psychology under Section 58–61–301;
>
> (3) a marriage and family therapist licensed to practice marriage and family therapy under Section 58–60–304;
>
> (4) a social worker licensed to practice social work under Section 58–60–204; and
>
> (5) a psychiatric and mental health nurse specialist licensed to practice advanced psychiatric nursing under Title 58, Chapter 31.

*Id.* § 78–14a–101 (1996).

■ Valley Mental Health contends that it had no duty because Kilgrow did not communicate any threat of physical violence against Jayleen or the children. In substance, Valley Mental Health argues that section 78–14a–102 effectively immunizes a therapist from liability for injuries caused by a patient to others in all but the limited circumstance where the therapist knows of a specific threat and then fails to take appropriate actions to discharge the resulting duty. However, the Wilsons contend that even though the Code so limits the listed persons' liability, under our case law, or a logical extension thereof, Valley Mental Health had a duty to properly treat or control Kilgrow. They argue that because Valley Mental Health failed to treat Kilgrow it failed to discover the threat to Jayleen and the children. Therefore, a duty to Jayleen and her children exists under the common law because Valley Mental Health should have known of the threat Kilgrow posed.

■ Because the question of whether the trial court erred in concluding there was no duty depends on the interpretation of section 78–14a–102, this is the first issue we address. The proper construction of a statute is a question of law. *See State v. Pena,* 869 P.2d 932, 936–37 (Utah 1994). In construing a statute, our primary purpose " 'is to give effect to the intent of the legislature in light of the purpose the statute was meant to achieve.' " *Sullivan v. Scoular Grain Co. of Utah,* 853 P.2d 877, 880 (Utah 1993) (quoting *Reeves v. Gentile,* 813 P.2d 111, 115 (Utah 1991)). When examining a statute, we look first to its plain language as the best indicator of the legislature's intent and purpose in passing the statute. Only if that language is ambiguous do we then turn to a consideration of legislative history and relevant policy considerations. *See World Peace Movement v. Newspaper Agency Corp.,* 879 P.2d 253, 259 (Utah 1994).

Applying these principles to the instant case, the language of section 78–14a–102 is clear and unambiguous. Again, it states: "A therapist has *no duty to warn or take precautions to provide protection* from any violent behavior of his client or patient, except where the patient communicated to the therapist an actual threat of physical violence against a clearly identified or reasonably

identifiable victim." Utah Code Ann. § 78–14a–102(1) (1996) (emphasis added). It is uncontroverted that in this case Kilgrow did not communicate any threat of physical violence against Jayleen or her son to any of the individuals responsible for Kilgrow's treatment at Valley Mental Health. This would seem to be a situation directly covered by the statute.

The Wilsons argue, however, that under the law set forth in *Rollins v. Petersen,* 813 P.2d 1156 (Utah 1991), and *Higgins v. Salt Lake County,* 855 P.2d 231 (Utah 1993), Valley Mental Health owed a duty to Jayleen and the children to treat and/or control Kilgrow, thereby protecting them from harm. More specifically, the Wilsons argue that a special relationship existed between Kilgrow's victims and Valley Mental Health and a duty arose because Valley Mental Health was negligent in its treatment of Kilgrow and *should* have known of the danger Kilgrow presented to Jayleen and the children. *See Higgins,* 855 P.2d at 239–40.

In a distinct line of cases beginning with *Beach v. University of Utah,* 726 P.2d 413 (Utah 1986), and ending with *Higgins,* this court addressed the issue of when the duty to control the conduct of another person arises so as to prevent that person from causing harm to themselves or others.[2] As we have stated on several occasions, we generally adhere to the basic tort principle that one has no duty to control the conduct of others. *See Rollins,* 813 P.2d at 1159; *Higgins,* 855 P.2d at 235. However, as our case law has developed, it has become clear that the duty to control another person may arise where a special relationship exists.[3]

In *Higgins* and *Rollins,* we enunciated some guiding principles to be used in determining whether a special relationship exists. First and most important, we take a policy-based approach to determining whether a

special relationship exists and consequently whether a duty is owed. *See Higgins,* 855 P.2d at 236. Because "[w]e are loath to recognize a duty that is realistically incapable of performance or fundamentally at odds with the nature of the parties' relationship," *id.* at 237, we have rejected claims made by injured parties of a duty running to large undifferentiated groups of people such as a university student body or the general public. *See id.* (citing *Beach,* 726 P.2d at 419–20; *Ferree,* 784 P.2d at 151; *Rollins,* 813 P.2d at 1161). Thus:

> In the context of a claim that an actor having custody or control of another owed a duty *to prevent harm to or by that other,* our overriding practical concern is whether the one causing the harm has shown him- or herself to be uniquely dangerous so that the actor upon whom the alleged duty would fall can be reasonably expected, consistent with the practical realities of that actor's relationship to the one in custody or under control, to distinguish that person from others similarly situated, to appreciate the unique threat this person presents, and *to act to minimize or protect against that threat.* When such circumstances are present, a special relationship can be said to exist and a duty sensibly may be imposed.

855 P.2d at 237 (emphasis added).

Both *Rollins* and *Higgins* involved claims that a mental health provider was negligent in failing to control a patient and that foreseeable harm to third persons resulted. Thus, they are clearly on point. In *Higgins,* we stated that in the context of both voluntary and involuntary health-care provider/patient relationships, whether a special relationship exists depends upon a careful evaluation of the facts. Specifically, whether

---

**2.** *See also Ferree v. State,* 784 P.2d 149 (Utah 1989); *Rollins v. Petersen,* 813 P.2d 1156 (Utah 1991).

**3.** Although the precise duty that arises where a special relationship is found should probably be phrased as "the duty to control another's conduct so as to prevent him from causing harm to self or others," we recognize that we have alternately abbreviated this precise phrasing to both the duty to control a third person's conduct and

the duty to prevent another's harm. *Compare Higgins,* 855 P.2d at 236 (stating "we have applied the Restatement's special relationship exception to the general rule that there is no duty to control the conduct of third persons"), *with id.* at 237 (stating "determining whether the actor has a duty to prevent another's harm requires careful consideration of the consequences of imposing that duty for the parties and for society").

the custodian knew or should have known that *unless steps were taken to protect others from the detainee*, he or she was "likely" to cause bodily harm to persons who were "reasonably identifiable by the custodian either individually or as members of a distinct group." ... "[F]or a person or group to be reasonably identifiable, the bodily harm caused will be of a type that the custodian knew or should have known the detainee was likely to cause if not controlled."

*Id.* at 238 (emphasis added) (quoting *Rollins*, 813 P.2d at 1162). In sum, "we will find a special relationship and consequent duty when a defendant knew of the likely danger to an individual or distinct group of individuals or when a defendant should have known of such danger." *Id.* at 240. ·

Having set forth both the statute and our case law, we must now decide which of the two governs and whether it makes a difference. Answering the second question first, it does make a difference because our case law imposes a broader duty than the statute. Although we stated in *Higgins* that we viewed the statute and our case law as consistent, upon closer examination it is plain they are not. To the extent that there is an actual threat of physical harm communicated by a patient to a therapist, our case law and section 78–14a–102 produce the same result. But under our case law a duty may also exist where a therapist "should have known" of the danger to a clearly identified or reasonably identifiable victim. That is, our case law may allow the imposition of a duty where, because of the defendant's negligent treatment, a threat to a reasonably identifiable victim is not discovered. On the other hand, the statute requires actual knowledge of a threat to a reasonably identifiable victim. There is no liability under the statute where the claim is that a therapist "should have known" of the threat to a clearly identified or reasonably identifiable victim.

We are troubled that section 78–14a–102 may inadvertently operate to create an incentive on the part of therapists to avoid diagnostically appropriate examinations that could reveal specific threats and result in a consequent duty to take preventive measures. But the language of the statute is plain. Therefore, our case law must yield.

Having determined that the instant case appears to be governed by section 78–14a–102, we now apply that statute to the facts. The sole defendant in this case is Valley Mental Health. Valley Mental Health does not fit within the definition of a therapist as it is set forth in section 78–14a–101 of the Code. However, we assume that the Wilsons seek to hold Valley Mental Health liable on the basis of respondeat superior, i.e., for negligent acts performed by its employees in the scope of their employment. *See generally Birkner v. Salt Lake County*, 771 P.2d 1053, 1056–58 (Utah 1989) (discussing respondeat superior doctrine). Thus, if the person responsible for Kilgrow's treatment at Valley Mental Health was a therapist as defined by the Code, he or she had no duty, and therefore Valley Mental Health cannot be held liable on the basis of respondeat superior.

Evidence in the record confirms that Dr. Karen Black falls within the definition of a therapist set forth in section 78–14a–101(1). The affidavit of Dr. Black also states that she oversaw the treatment of Kilgrow by Laraine Anderson, a registered nurse. Anderson stated in her affidavit that she met with Dr. Black to discuss Kilgrow's situation and treatment. Therefore, although there is no evidence to show whether Anderson is a nurse licensed to practice advanced psychiatric nursing as set forth in section 78–14a–101(5), this is not necessary as it appears that Dr. Black was ultimately responsible for Kilgrow's treatment on the day in question.[4] Because Dr. Black is a therapist within the statute, there was no duty and, therefore, no cause of action exists.[5]

---

4. We note, however, that had Anderson's treatment of Kilgrow not been overseen by a "therapist" and had she not herself qualified as a "therapist," our case law would then govern, and a duty could be found to exist based upon the

fact that she "should have known" of the danger Kilgrow posed.

5. This does not mean that there was no duty to treat Kilgrow properly, just that that duty ran to Kilgrow. Thus, Kilgrow could certainly bring a

In conclusion we hold as follows: section 78–14a–101 exclusively defines the duty of a therapist in cases where it is alleged that a therapist had a duty to warn or take precautions to provide protection from the violent behavior of a client. There is no such duty unless there is an actual threat of physical violence against a clearly identified or reasonably identifiable victim communicated by the patient to the therapist. In cases not involving therapists, our case law still governs.

Affirmed.

HOWE, C.J., DURHAM, Associate C.J., and PAGE, J., concur in Justice ZIMMERMAN's opinion.

STEWART, J., concurs in the result.

Having disqualified himself, RUSSON, J., does not participate herein; District Judge RODNEY S. PAGE sat.

medical malpractice cause of action against his doctors and Valley Mental Health if he could show he was not treated in accordance with the appropriate standard of care. *See Farrow v.*

*Health Services Corp.,* 604 P.2d 474, 476 (Utah 1979) (setting forth duty of care owed by a physician to his patient).