2002 UT 64

Eric T. YOUNG, a minor, by and through Priscilla Young, his general guardian and guardian-ad-litem, and Priscilla Young, individually, Plaintiff and Appellant,

v.

SALT LAKE CITY SCHOOL DISTRICT and John Does 1–20, Defendants and Appellees.

No. 20001144.

Supreme Court of Utah.

July 19, 2002.

Robert B. Sykes, Salt Lake City, for plaintiffs.

Mark L. Shurtleff, Att'y Gen., Brent A. Burnett, Barry G. Lawrence, Asst. Att'ys Gen., Salt Lake City, for defendants.

DURRANT, Associate Chief Justice:

¶ 1 This appeal concerns the duties owed by Salt Lake City School District ("the District") to Eric Young, an elementary school student who was injured while riding his bicycle to a mandatory parent-teacher-student ("PTS") conference. Because Young's injury occurred at a crosswalk outside the District's control, the district court held that the District owed Young no common law, regulatory, or statutory duties. We affirm, concluding that the District owed Young (1) no common law duties because it lacked a special relationship with him at the time of the accident, (2) no regulatory duties because rule 920–5–2(A)(3) of Utah's Administrative Code does not create a private cause of action, and (3) no statutory duties because the plain language of subsection 41–6–20.1(3) of the Utah Code applies only to entities that have the authority to enact traffic laws.

## BACKGROUND

¶ 2 "Before we recite the facts, we note that in reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Higgins v. Salt Lake County*, 855 P.2d 231, 233 (Utah 1993). We state the facts accordingly.

¶ 3 On October 15, 1996, a car driven by Linda Frost accidentally struck and injured Young, a minor, while he was riding his bicycle to a mandatory PTS conference at Dilworth Elementary, a school operated by the District. The accident occurred just opposite Dilworth Elementary at a crosswalk located at approximately 1953 South 2100 East, Salt Lake City, Utah.

¶ 4 On October 28, 1997, Young, acting through his mother, sued Jennifer Wimmer,[1] claiming that she had parked illegally near the crosswalk and that her vehicle had obstructed both his view of oncoming traffic and Frost's view of pedestrians entering the crosswalk.[2] Young did not sue Frost because of a prior settlement he had reached with her.

¶ 5 Young later amended his complaint on February 23, 1998, and added the District and Salt Lake City as defendants, alleging that (1) the District had failed to provide a crossing guard and flashing warning lights at the crosswalk and (2) Salt Lake City had failed to erect appropriate road signals (i.e., a "no parking" sign and red curbs). Thereafter, Young amended his complaint a second, third, and fourth time.

¶ 6 In the last of these complaints, Young named the District and its agents as the sole defendants, asserting that the District had caused his injury in two ways.[3] First, he claimed that the District had neglected to inform Salt Lake City of dangerous parking conditions of which it had knowledge near the crosswalk. Second, he alleged that the District had breached its duty to provide a crossing guard and flashing warning lights.

¶ 7 Subsequently, the District filed a motion for summary judgment, arguing, inter alia, that it had no duty to (1) inform Salt Lake City of dangerous parking conditions

existing at the crosswalk, (2) supply a crossing guard, or (3) provide flashing warning lights. In response, Young claimed that the District had an obligation to protect him due to his special relationship with it, duties arising at common law, and obligations imposed by statute. The district court granted the District's summary judgment motion, concluding, among other things, that no "duty existed between the defendant and plaintiff with respect to traffic signs and conditions at or around the crosswalk."

¶ 8 Young appeals, and we have jurisdiction pursuant to section 78–2–2(3)(j) of the Utah Code. Utah Code Ann. § 78–2–2(3)(j) (1999). On appeal, Young contends that the district court erred in granting the District's summary judgment motion for three reasons. To begin with, he argues that he had a special relationship with the District that obligated it to inform Salt Lake City of dangerous parking conditions present near the crosswalk. In particular, citing both case law and rule 920–5–2(A)(3) of Utah's Administrative Code, he contends that the District had a duty to prepare a safe routing plan for students attending Dilworth Elementary and that as a result of this duty it was obligated to inform Salt Lake City of hazardous parking conditions of which it had knowledge.[4] Additionally, he alleges that the District had a self-imposed duty to report safety deficiencies to Salt Lake City.[5] Finally, relying on

---

1. We note that Young's mother also sued in her individual capacity for loss of consortium. For the purposes of this appeal, however, we use Young's lawsuit to refer to all claims brought by him and his mother.

2. Young also sued the State of Utah regarding the validity of a Medicaid lien.

3. Young included no claim against Wimmer because he had settled with her. As for his claim against the State of Utah, the district court granted summary judgment in favor of the State. An explanation for his decision not to sue Salt Lake City is not included in the record.

4. Rule 920–5–2(A)(3) of Utah's Administrative Code declares as follows:

   Each elementary school shall prepare and update annually a routing plan. The plan shall show, as a minimum, the walking routes on the street system within the school boundaries,

the school location, existing traffic controls, and established school crossings.... An explanation of the plan, instruction to parents to walk the route with their children, and an outline of areas of concern should also be included. The plan shall be reviewed annually by the School Traffic Safety Committee. After review by the Committee, the plan shall be sent to each parent whose children attend the elementary school, and to the local and state jurisdictions that have responsibility for highways within the elementary school boundaries. Utah Admin. Code R920–5–2(A)(3) (1996).

5. In so doing, Young points to the following provision from Salt Lake City School District's School Board Policies and Practices: "[t]he Council on School Safety Practices is a district committee to promote safety practices in the schools, including public awareness for safety practices related to schools and informing cooperating agencies who have responsibility for safety conditions. Such information shall include ... items related to school safety practices."

subsection 41–6–20.1(3) of the Utah Code, he maintains that the District had a duty to provide both a crossing guard and flashing warning lights.

¶ 9 The District responds that it owed Young no common law duties because it lacked a special relationship with him at the time the accident occurred. It further argues that it did not owe Young any regulatory or statutory duties because (1) rule 920–5–2 of Utah's Administrative Code merely requires it to produce an informative routing plan and (2) the plain language of subsection 41–6–20.1(3) of the Utah Code applies only to entities that have the authority to enact traffic laws.

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 10 Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "When reviewing a court's decision to grant summary judgment, we examine the court's legal conclusions for correctness." *Tustian v. Schriever,* 2001 UT 84, ¶ 13, 34 P.3d 755. Where this review requires us to examine statutory language, we look first to the plain meaning of the statute. *State v. Casey,* 2002 UT 29, ¶ 20, 44 P.3d 756.

### II. COMMON LAW DUTIES

¶ 11 Young initially contends that the District had an affirmative common law obligation to inform Salt Lake City of dangerous conditions of which it had knowledge existing at the crosswalk. He further argues that the District had a common law duty to provide both a crossing guard and flashing warning lights at the crosswalk the night of the PTS conference. We conclude that the District owed Young none of the aforementioned duties because it did not have a special relationship with him at the time of the accident.

¶ 12 In reaching this conclusion, we note that to prevail upon a negligence claim under Utah law, a plaintiff must establish, among other things, that the defendant owed him or her a duty of care. *Williams v. Melby,* 699 P.2d 723, 726 (Utah 1985); *Lamarr v. Utah State Dep't of Transp.,* 828 P.2d 535, 537 (Utah Ct.App.1992). Absent a showing that the defendant owed any duty, the plaintiff's claim has no merit, and he or she may not recover. *Rollins v. Petersen,* 813 P.2d 1156, 1159 (Utah 1991).

¶ 13 Ordinarily, a person has no affirmative common law duty to protect another from harm. *Gilger v. Hernandez,* 2000 UT 23, ¶ 15, 997 P.2d 305. There is an exception to this general rule, however, where a special relationship exists between the parties. *Id.* Here, Young claims that he had a special relationship with the District at the time he sustained his injury. We disagree.

¶ 14 To be certain, a special relationship may arise between a school district and a child attending one of its schools. *See Pratt v. Robinson,* 39 N.Y.S.2d 554, 384 N.Y.S.2d 749, 349 N.E.2d 849, 852 (1976). The extent of this relationship is limited to the district's custody over that child, however. *Id.; see also Norton v. Canandaigua City Sch. Dist.,* 208 A.D.2d 282, 624 N.Y.S.2d 695, 697–98 (N.Y.App.Div.1995) (stating that the district's duty is limited by time and space). Indeed, when a school district has custody of a child, it acts as a substitute for the student's parents or guardian, *Norton,* 624 N.Y.S.2d at 697–98, and has a custodial duty of protection, *Pratt,* 384 N.Y.S.2d 749, 349 N.E.2d at 852. As the Restatement puts it, by taking custody of the child, the district has "deprived [the child] of the protection [from] his parents or guardian. Therefore, [it] ... is properly required to give him the protection which [he has lost]." Restatement (Second) of Torts § 320 cmt. b. By comparison, when a school district lacks custody, it has no protective obligation and no special relationship exists. *Id.; see also Norton,* 624 N.Y.S.2d at 697–98. Accordingly, we must ascertain whether the District had custody of Young at the moment he was injured. We hold that it did not.

¶ 15 Our conclusion in this respect is based on several considerations. First, Young's elementary school had adjourned for the day,

and he had been released into the care of his parents. *Rife v. Long*, 127 Idaho 841, 908 P.2d 143, 149 (1995) (noting that the child was not in the district's custody because his school had adjourned for the day and his parents had resumed control over his well-being). Second, Young's injury did not occur on premises within the District's control. Rather, Salt Lake City had the responsibility to maintain the crosswalk at which Young was injured. *Cf. Norton*, 624 N.Y.S.2d at 697–98 (stating that a school district's duty to a child is "limited by time and space"). As such, the District had no authority to regulate traffic at or near the crosswalk and could not have ordered any alterations or enhancements in the traffic signals governing the area. Lastly, at the time he sustained his injury, Young was not participating in a curricular, or extra-curricular, school-sponsored event; he was simply *in the process of traveling* to such an event. *Cf. Pratt*, 384 N.Y.S.2d 749, 349 N.E.2d at 853 (explaining that the district lacked custody once it safely dropped off a student at his bus stop just like it would lack custody if "the child had been hurt while walking home from a neighborhood school").

¶ 16 Given that the District did not have custody of Young at the time he suffered his injury, it lacked a special relationship with him at that time. The general rule that one has no affirmative common law duty to protect another from harm thus remained in effect. Consequently, we conclude that the District had no common law duty to inform Salt Lake City of dangerous conditions existing at or near the crosswalk, to request a crossing guard, or to provide flashing warning lights.[6]

¶ 17 Chief Justice Durham disagrees with this conclusion, arguing that three other factors should be considered in determining whether a special relationship existed and that the District actually had custody over Young because he was within its orbit of control. In our view, however, the three additional factors she identifies as pertinent to whether Young had a special relationship with the District (i.e., the foreseeability of the harm, Young's dependence on the District for safety, and the ease with which the District could have satisfied its obligation) are irrelevant to the question at issue. Foreseeability of harm does not address whether the District possessed a special relationship with Young because even if a dangerous condition was certain to cause harm, that fact, standing alone, reveals nothing about the relationship between the two parties.[7] Like-

---

6. Although we conclude that the District had no common law duty to report a dangerous condition of which it had knowledge, we note that it would be salutary for school districts to assist cities in maintaining safe streets, especially where young children are involved. We urge school districts to report dangerous safety conditions of which they become aware.

7. The cases cited by Chief Justice Durham do not require that we examine foreseeability of harm for three reasons. First, *Wilson*, *Higgins*, and *Rollins* are distinguishable because they dealt with whether a medical provider owed a duty of care to an individual injured by a patient within the custody, or control, of the medical provider. *Wilson v. Valley Mental Health*, 969 P.2d 416, 419–20 (Utah 1998); *Higgins v. Salt Lake County*, 855 P.2d 231, 238 (Utah 1993); *Rollins v. Petersen*, 813 P.2d 1156, 1161–62 (Utah 1991).

Second, those three cases, along with *Beach v. University of Utah*, 726 P.2d 413 (Utah 1986), clearly demonstrate that control over, or custody of, the primary person who caused the injury is a necessary prerequisite before engaging in a foreseeability of harm analysis. Indeed, in describing the meaning of *Rollins* and *Beach*, we stated in *Higgins* that

[a] general principle can be drawn from these cases. *In the context of a claim that an actor having custody or control of another owed a duty to prevent harm to or by that other,* our overriding practical concern is whether the one causing the harm has shown him- or herself to be uniquely dangerous so that the actor upon whom the alleged duty would fall can be reasonably expected, consistent with the practical realities of that *actor's relationship to the one in custody or control,* to distinguish that person from others similarly situated, to appreciate the unique threat this person presents, and to act to minimize or protect against that threat.

*Higgins*, 855 P.2d at 237 (emphasis added). In *Wilson*, we used similar language to describe the meaning of *Higgins*, and noted that it and *Rollins* were "clearly on point." *Wilson*, 969 P.2d at 419. Accordingly, all four cases stand for the proposition that no foreseeability analysis is required if a party lacks custody over, or control of, the primary tortfeasor.

Finally, *Beach* addressed foreseeability of harm only after noting that the plaintiff's argument concerning the existence of a special relationship rested primarily on the fact that the University's agent knew, or should have known, of the plaintiff's propensity to become disoriented after

wise, the ease with which a party may fulfill a duty is irrelevant to whether a special relationship exists because that question assumes a party already has a duty. The inquiry thus begs the question we are seeking to resolve (i.e., whether a duty exists). Finally, the dependence Young and his mother allegedly placed on the District has no relevance to whether a special relationship existed because any dependence they might have had hinges on whether the District had custody of Young or control over the street. Indeed, just because a district has a special relationship with a student at school, does not mean that a special relationship exists at all times. *Pratt*, 384 N.Y.S.2d 749, 349 N.E.2d at 852. Because the District had no ability to implement safety measures governing the city street and lacked custody of Young, we conclude that no special relationship existed. *Cf. Cannon v. Univ. of Utah*, 866 P.2d 586, 589 (Utah Ct.App.1993) (holding that the plaintiffs, who were en route to a basketball game, were not business invitees of the University of Utah at the time of their accident, and therefore had no special relationship with it, because they were injured on a city street, not university property).

¶ 18 We also disagree with Chief Justice Durham's opinion because it would dramatically expand tort liability. Indeed, despite the fact that the District had no authority to erect street signage, activate the flashing warning signals, or put crossing guards in place, she proposes that the District be made liable for failing to request that the city implement safety measures. It would be a dramatic expansion of tort liability, however, to suggest that Party A, which has no authority to implement safety measures, is nevertheless liable for Party B's failure to implement such measures simply because Party A failed to request that Party B do so. Moreover, although Chief Justice Durham attempts to place a geographic limitation on the duty she would establish, we see no reason why the application of her test would restrict the duty to areas "adjacent" to a school. For instance, if a group of elementary students lived in an apartment complex a mile away from their school and their principal learned about a hazardous condition near that complex that was likely to cause harm, all the elements of her test would be satisfied. Specifically, the students would be dependent on the principal for their safety, the harm would be foreseeable, and the District could easily satisfy its obligation by calling the city. Hence, the duty that Chief Justice Durham would create is incapable of being construed narrowly and would make it difficult, if not impossible, for courts of this state to apply any disciplined analysis from one case to the next.

¶ 19 We are similarly unpersuaded by her public policy argument that if no duty is imposed here "there is little hope that accidents such as this will be prevented," even though we too are extremely concerned with the protection of young children. In our opinion, the best opportunity to prevent accidents of this type rests with the entity that controls the street and therefore is authorized to implement safety measures, the automobile drivers, and the person who had custody of Young. Regardless, we think that any decision to expand liability to schools for failing to request that cities correct unsafe conditions on city-owned streets is a matter better left to the legislature.

### III. STATUTORY AND REGULATORY DUTIES

¶ 20 We next examine whether the District owed Young any regulatory or statutory duties of care. With respect to this question, Young contends that the District had a mandatory regulatory duty to (1) "prepare ... a [safe] routing plan" for students attending Dilworth Elementary, (2) "outline ... areas of concern" in that plan, and (3) send that plan to "local and state jurisdictions that have responsibility for highways within the [school's] boundaries." Utah Ad-

---

drinking. *Id.* at 416. As such, that case does not establish any requirement regarding the factors we must consider in determining whether a special relationship exists. Rather, at most, it supports the proposition that foreseeability of harm *may* be relevant in some situations. In our view, however, those situations are limited to circumstances comparable to *Wilson, Higgins,* and *Rollins* (i.e., where a party on whom a duty is sought to be imposed has control over, or custody of, an individual and that individual has injured another person).

min. Code R920–5–2(A)(3) (1996). He then argues that, based on these explicit regulatory duties, the District had a duty to inform Salt Lake City of known dangerous parking conditions existing near the crosswalk at which he was injured. We disagree.

¶ 21 Although imposing some obligations on school districts, rule 920–5–2(A)(3) of Utah's Administrative Code does not expressly impose liability on the District for not informing Salt Lake City of dangerous parking conditions of which it had knowledge. Moreover, we decline to infer liability from the wording of the regulation because the stated purpose behind rule 920–5–2(A)(3) is to ensure uniformity in traffic control devices and crossing guards, Utah Admin. Code R920–5–1(B) (1996) (declaring that the sole purpose behind rule 920–5–2(A)(3) is "to standardize, as much as possible, applications of traffic control devices and crossing guards on all public highways in the State of Utah"), not to make school districts liable for any resulting inconsistencies. Further, in the absence of a clear indication from the regulation itself, we are "not generally in the habit of implying a private right of action...." *Broadbent v. Bd. of Educ. of the Cache County Sch. Dist.*, 910 P.2d 1274, 1278 (Utah Ct.App.1996); *see also Milliner v. Elmer Fox & Co.*, 529 P.2d 806, 808 (Utah 1974) (holding that where a criminal statute did not provide for a private right of action, the matter was best left to the Legislature). The regulation at issue includes no such clear indication. Accordingly, we hold that no private right of action existed.[8]

¶ 22 Relying on subsection 41–6–20.1(3) of the Utah Code, Young next asserts that the District had a duty to provide a crossing guard at the crosswalk the night he was injured. Pointing to that same subsection, he also alleges that the District had a duty to provide flashing warning lights. We conclude that the statutory provision on which Young relies does not support either contention. Specifically, subsection 41–6–20.1(3) of the Utah Code declares that "[f]or all reduced speed school zones on highways ... *the local authority shall ... provide, train, and supervise school crossing guards [and] provide for the[ ] operation of ... warning lights ....*" Utah Code Ann. § 41–6–20.1(3)(a)–(b) (1996) (emphasis added). The District does not qualify as a "local authority" as defined by the Code, however, because it cannot enact traffic laws. Indeed, for the purpose of chapter 6 of title 41 of the Utah Code, a "local authority" is restricted to "every county, municipal, and other local board or body having authority to enact laws relating to traffic under the constitution and laws of the state." *Id.* § 41–6–1(17). Accordingly, the plain language of subsection 41–6–20.1(3) of the Utah Code imposes no statutory duties on the District. *See Rife*, 908 P.2d at 149 (examining an almost identical statute and concluding that the school district clearly "does not fall within the definition of a 'local authority' ").

## CONCLUSION

¶ 23 We hold that the District did not owe Young any common law duties at the time of the accident because it did not have a special relationship with him at that time. Further, the District did not owe Young any regulatory or statutory duties because rule 920–5–2(A)(3) of Utah's Administrative Code does not create a private right of action and the plain language of subsection 41–6–20.1(3) of the Utah Code applies only to entities that possess the authority to enact traffic laws. We therefore affirm the district court's summary judgment ruling.

¶ 24 Justice HOWE, Justice RUSSON, and Justice WILKINS concur in Associate Chief Justice DURRANT'S opinion.

---

8. Young also contends that by enacting some policies on its own initiative the District created a duty to report dangerous safety conditions to "cooperating agencies" such as Salt Lake City. We find this argument without merit for two reasons, however. First, the school board policy cited by Young does not create a private right of action against the District. Instead, employing ambiguous language, it simply says that the "Council on School Safety Practices is a district committee to promote safety practices in the schools, including ... informing cooperating agencies who have responsibility for safety conditions ... [of] items related to safety practices." Second, if we did impose liability on the District triggered by the enactment of *some* measures designed to improve traffic safety, we would create an incentive for districts to enact *no* such measures. This we decline to do.

DURHAM, Chief Justice, dissenting:

¶ 25 The majority concludes that the District had no common-law duty to inform Salt Lake City of conditions the District knew were dangerous to students because the District did not have a special relationship with the injured child. I respectfully dissent. Whether under the standards set forth in our prior case law or under the rules the majority imports from other jurisdictions, I am convinced that a special relationship existed between the injured student and the District. I would hold that under the circumstances of this case—where the District knew of the dangerous conditions, the danger was immediately adjacent to the school, the District took no action to warn or protect students, and the child was injured while attending a mandatory school function—the District had at least the minimal duty of informing the city of the need for a safe crosswalk and crossing guard.

### I. Utah Caselaw

¶ 26 In considering whether a special relationship existed between the District and the student, the majority focuses only on the question of whether the school had custody over the child at the time of the injury. The majority takes this approach primarily from the comments to the Restatement (Second) of Torts and New York case law. This rigid inquiry, however, is contrary to the approach we have taken in the past when considering whether a special relationship exists. In *Higgins*, we reiterated the rule:

> [U]nlike the Restatement writers, we do not attempt in our duty analysis to rigorously maintain the artificial categorization that differentiates between cases based on whether the actor owes the duty to the victim or to the victimizer, ... nor do we apply the Restatement's precise formulation uncritically. Instead, we have taken a policy-based approach in determining whether a special relation should be said to exist and consequently whether a duty is owed.

*Higgins v. Salt Lake County*, 855 P.2d 231, 236–37 (Utah 1993); *see also Wilson v. Valley Mental Health*, 969 P.2d 416, 419 (Utah 1998); *Rollins v. Petersen*, 813 P.2d 1156,

1161–62 (Utah 1991); *Ferree v. State*, 784 P.2d 149, 151–52 (Utah 1989); *Beach v. Univ. of Utah*, 726 P.2d 413, 418 (Utah 1986). The policy approach, we noted, "is more realistic than that which would result from a broad reading of the Restatement, especially when one considers the fact that at bottom, the issue is one of negligence—a lack of reasonable care." *Higgins*, 855 P.2d at 237. A consideration of policy factors is necessary to a fair evaluation of tort duties:

> It is meaningless to speak of "special relationships" and "duties" in the abstract. These terms are only labels which the legal system applies to defined situations to indicate that certain rights and obligations flow from them; they are "an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection."

*Beach*, 726 P.2d at 418 (quoting William Prosser, *Law of Torts* 333 (3d ed.1964)). Thus, in *Higgins* and its predecessors we abandoned the "mechanistic relational models" of the Restatement and based our analysis on "careful consideration of the consequences of imposing that duty for the parties and for society." *Higgins*, 855 P.2d at 237; *see also Beach*, 726 P.2d at 418.

¶ 27 In considering whether a special relationship exists, we have weighed a number of factors, including: (1) the foreseeability of the harm, *see Wilson*, 969 P.2d at 419–20; *Higgins*, 855 P.2d at 240; *Rollins*, 813 P.2d at 1162; *Beach*, 726 P.2d at 416–17; (2) the relationship between the parties, *see Gilger v. Hernandez*, 2000 UT 23, ¶¶ 15 & 18, 997 P.2d 305; *Wilson*, 969 P.2d at 419; *Higgins*, 855 P.2d at 237; *Beach*, 726 P.2d at 415–16 & 418; and (3) the ease with which the defendant could have fulfilled the duty, *see Gilger*, 2000 UT 23 at ¶ 17, 997 P.2d 305; *Wilson*, 969 P.2d at 419; *Higgins*, 855 P.2d at 237; *Beach*, 726 P.2d at 418. Our sister states have considered a similar range of factors when determining whether a special relationship exists. California and Idaho, for example, weigh the following factors:

> The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the con-

nection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Rife v. Long,* 127 Idaho 841, 908 P.2d 143, 148 (1995) (quoting *Isaacs v. Huntington Mem'l Hosp.,* 38 Cal.3d 112, 211 Cal.Rptr. 356, 695 P.2d 653, 658 (1985) (citations omitted)).

¶ 28 A consideration of these factors, with particular emphasis on the factors that we have found determinative in the past, leads to the conclusion that a special relationship existed here. First, the court should look to the foreseeability of the harm under the circumstances of the case. We have stated that "we will find a special relationship and consequent duty when a defendant knew of the likely danger to an individual or distinct group of individuals or when a defendant should have known of such danger." *Higgins,* 855 P.2d at 240; *see also Wilson,* 969 P.2d at 419–20; *Rollins,* 813 P.2d at 1162; *Beach,* 726 P.2d at 416–17. Foreseeability is necessarily a flexible concept:

> Where the degree of result or harm is great, but preventing it is not difficult, a relatively low degree of foreseeability is required. Conversely, where the threatened injury is minor but the burden of preventing such injury is high, a higher degree of foreseeability may be required.

*Rife,* 908 P.2d at 148–49 (quoting *Sharp v. W.H. Moore,* 118 Idaho 297, 796 P.2d 506, 509–10 (1990)). In this case, the risk of harm was great, as it is any time young children are compelled to cross busy streets. The burden of prevention, by contrast, was very low. The danger could have been avoided by a phone call. The District was required only to report the dangerous crosswalk and the need for a crossing guard to the city. The circumstances of this case extend well beyond the low degree of foreseeability required to find a special relationship. The District had every reason to know of the

danger: the dangerous condition was adjacent to the school; parents had reported concerns about the crosswalk to the school; and the District itself scheduled the conference for a time when a crossing guard was not scheduled to be at the intersection. That a child could be seriously injured on the way to the conference was, therefore, quite foreseeable.

¶ 29 A second factor worthy of consideration is the underlying relationship between the parties. We have stated that "[t]he essence of a special relationship is dependence by one party upon the other or mutual dependence between the parties." *Beach,* 726 P.2d at 415–16; *see also Gilger,* 2000 UT 23 at ¶¶ 15 & 18, 997 P.2d 305. On the other hand, "[w]e are loath to recognize a duty that is ... fundamentally at odds with the nature of the parties' relationship." *Higgins,* 855 P.2d at 237; *see also Wilson,* 969 P.2d at 419; *Beach,* 726 P.2d at 418. The majority embraces the concept that the school has a custodial relationship with its students while the students are within the charge of the school. The majority, however, applies this concept rigidly, presuming that once a child steps beyond the schoolhouse gates the school relinquishes all responsibility for the child and fully transfers custody to the parents. Such a rule misapprehends the relationship between schools, parents, and students. The custodial relationship of the school and the parents over the child must properly be viewed as overlapping. The school's responsibility should be commensurate with its awareness of the danger, its ability to control the condition, and the degree to which parents reasonably rely upon the school to provide safety precautions. Here, it was the District that scheduled the conference for a time when no crossing guard would be at the intersection, the District that made attendance at the conference mandatory for children, the District that had been warned of the dangerous conditions, and the District that chose inaction by failing either to warn parents or remedy the situation. It is only natural that parents would rely upon the District—the entity that scheduled, ran, and required attendance at the conference— to ensure that the same safety precautions would be taken at night as were taken during

the day. This dependence of the parents and children upon the District, in addition to the school's control over the circumstances, makes the special relationship between the parties quite clear.

¶ 30 A third factor to consider is the burden that such a duty would place upon the defendant. We have refused to find a special relationship if by doing so "the defendant in question would be unable to perform the duty without either radically changing its character or drastically circumscribing the function it was charged with performing." *Higgins*, 855 P.2d at 237; *see also Gilger*, 2000 UT 23 at ¶ 17, 997 P.2d 305; *Wilson*, 969 P.2d at 419; *Beach*, 726 P.2d at 418. In this case, the burden such a duty would place upon the District is quite minimal and fits squarely within the character and function of the school's other duties. I would hold that the school only has a duty to report the dangerous conditions to the proper authority where the danger is contiguous to the school property and threatens an important pathway to the school.[1] Placing the duty to report upon the school fits within the school's typical responsibilities, including ensuring safety of arriving children during class hours. Indeed, as the entity that schedules school activities, the school is in a better position than any other person or entity to report such a problem to the city. Surely, the duty to make a phone call is not burdensome.

¶ 31 Finally, it is worth considering the overarching policy of preventing future harm. The majority states that while the District had no duty to report the danger, "it would be salutary" for the District to assist the city in maintaining safe streets. Where the lives of children are at stake, I find it inadequate to describe the District's duty as merely salutary. It would be unrealistic to expect that the city could independently remain aware of all potentially dangerous conditions adjacent to school property and the intricate schedules of various schools. If the District has no duty to inform the city of dangers and the need for a crossing guard after hours, there is little hope that accidents such as this will be prevented.

## II. Other Law

¶ 32 Even if I were to agree with the majority's abandonment of our precedent in analyzing common-law duties, I would still find a special relationship here under the approach the majority adopts from other jurisdictions. The majority finds the critical inquiry to be whether the school had "custody" of the child at the time of the accident. However, the cases cited by the majority in support of the proposition that the school district did not have custody are easily distinguishable.

¶ 33 In *Rife v. Long*, the court found that the school district owed no common law duty to a student who was "no longer in a relationship of control or supervision by the District." 127 Idaho 841, 908 P.2d 143, 148 (1995). In reaching this conclusion, however, the court first considered a number of factors, including the foreseeability of the harm and the policy consequences of finding a special relationship. *Id.* The court did not, as the majority suggests, lay down a general rule that a school has no duty to a child after classes have adjourned for the day. Rather, the court determined, based on the specific facts of that case, that the student had no special relationship with the school at the time of the child's injury.

¶ 34 Even if the case were only concerned with custody, the facts of *Rife* are clearly distinguishable from the current case. The student in that case had crossed the school soccer field and was apparently a block or two beyond the soccer field when the accident occurred. *Id.* at 145. Here, the stu-

---

1. It should be noted that this accident did not take place at an intersection blocks from the school or at a place where there was no history of providing safety precautions. The majority suggests that finding a special relationship in this case would "dramatically expand tort liability." To the contrary, following the policy-based analysis we have used in the past would help to ensure that liability is found only where the danger is known, nearby, and could have been easily remedied by the liable party. Indeed, rather than basing liability solely on a single factor that may have only marginal relevance, i.e., "custody," this analysis bases liability on the knowledge, ability, and responsibility of the tortfeasor. There is, therefore, no true risk of a slippery slope.

dent was, quite literally, going in the other direction; he was coming back to school for a mandatory meeting, and was right in front of the school when the accident occurred.

¶ 35 The majority equates custody of the child with what it terms "control" over the dangerous circumstances. In the middle of the discussion on custody, the majority states that Salt Lake City, not the District, had the responsibility to "maintain the crosswalk" where the accident occurred, and that this lack of "control" over the premises negated any duty the District might owe to the child. It then cites to *Norton v. Canandaigua City School District,* stating that the duty a school district owes to a child is "limited by time and space." 208 A.D.2d 282, 624 N.Y.S.2d 695, 697 (N.Y.App.Div.1995). While I do not disagree with this general proposition, it avails us little on these facts. There is no question the school was not required to supply a crossing guard or to establish a no-parking sign; these are statutorily defined as duties of the city. But maintenance of the crosswalk has nothing to do with who had custody of Young at the time he was injured. The issue is whether the District, because of the nature of its relationship with the child and its authority to request a crossing guard and no-parking sign, had a duty to report the need for such safety measures to the city.

¶ 36 In *Norton,* the student was hit by a car while crossing the street to wait for her bus to take her to school. *Id.* at 696. As in *Rife,* these facts are wholly different than the facts before us now. Unlike the current case, the child in *Norton* was not injured at a crosswalk adjacent to the school or where a crossing guard had been provided in the past.

¶ 37 Finally, in *Pratt v. Robinson,* a student was injured by a car at a busy intersection three blocks from where the school bus dropped her off for the day. 39 N.Y.2d 554, 384 N.Y.S.2d 749, 349 N.E.2d 849, 850 (1976). The court found that the school no longer had custody of the student at the time of her injury. It reasoned that the duty owed by the school to its student is

> coextensive with and concomitant to its physical custody of and control over the child. When that custody ceases because

the child has passed out of the *orbit of its authority* in such a way that the parent is perfectly free to reassume control over the child's protection, the school's custodial duty also ceases.

*Id.* at 852 (emphasis added).

¶ 38 In *Pratt,* the court's use of the phrase "orbit of [the school district's] authority" is particularly apt to defining the physical parameters of the school district's responsibility to its students. While the *Pratt* court held that the school district does not owe a duty to a student crossing a busy street three blocks from where the school bus dropped her off, it conceded that by offering students the option of busing, the school district "extended its control over its pupils from the school door to the bus stop . . . ." *Id.* at 853. In the case before the court a similar "orbit" exists, defined by the extent to which the school had extended its authority over the passageway to the school. It is difficult to imagine how such an "orbit of authority" could be strictly limited by the school's formal boundaries and not reach the crosswalk immediately in front of the school building where the child was headed.

¶ 39 For the foregoing reasons, I would hold that the District had a special relationship with the injured student and, consequently, the District had a duty to report the dangerous conditions to the city.