2004 UT App 274

Jane DOE (a pseudonym), individually and as parent and guardian ad litem of John Doe (a pseudonym), a minor, Plaintiffs and Appellants,

v.

The CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS, a Utah corporation sole; and George K. Tilson, Defendants and Appellee.

No. 20030511–CA.

Court of Appeals of Utah.

Aug. 19, 2004.

Mary C. Corporon, Corporon & Williams PC, Salt Lake City, for Appellants.

Von G. Keetch, Alexander Dushku, Kirton & McConkie, L. Rich Humphreys, and Karra J. Porter, Christensen & Jensen, PC, Salt Lake City, for Appellee.

Before Judges DAVIS, GREENWOOD, and THORNE.

OPINION

GREENWOOD, Judge:

¶1 Plaintiffs Jane Doe (Jane) and John Doe (John) appeal from the trial court's order dismissing their negligence claims against the Corporation of the President of The Church of Jesus Christ of Latter-day Saints (COP or the Church) on the basis that Jane's claim was untimely and John's claim was statutorily barred. We affirm.

## BACKGROUND [1]

■ ¶ 2 For many years, Jane and her son John were members of the Church and regularly attended a ward in the Salt Lake Holladay Stake.[2] George Tilson was also a member of the Church, and held the positions of "High Priest"[3] and scout leader within the Church.

¶ 3 Beginning in 1966 and continuing through 2002, COP received several complaints from its members that Tilson was sexually abusing children within his ward.[4] However, COP not only failed to do anything in response to these complaints, it actively concealed Tilson's sexual abuse from its members and secular authorities. Moreover, COP allowed Tilson to continue to hold the positions of High Priest and scout leader.

¶ 4 Two of Tilson's victims during the time period that he was alleged to have engaged in child sexual abuse were Jane and John. In the summer of 1976, Tilson enticed Jane, who was then thirteen years old, into his home where he fondled her under her clothing. Tilson sexually abused John, Jane's son, some time between 1993 and 1996 when John was approximately five years old. John's abuse also occurred in Tilson's home after Tilson lured him away from a neighbor's yard where he was playing.

¶ 5 In the fall of 2001, Jane learned of news reports that led her to believe that COP had prior knowledge of Tilson's propensities to sexually abuse children. Jane's subsequent investigation of these reports ultimately prompted her to file a complaint in June of 2002 against Tilson, alleging that he had sexually abused Jane and John, and against COP, alleging negligence, breach of fiduciary duty, and intentional infliction of emotional distress arising out of Tilson's alleged sexual abuse. In response, COP filed a motion to dismiss, pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. Shortly thereafter, Plaintiffs filed a Notice of Constitutional Challenge to Utah Code Annotated section 78–12–25.1 (2002).

¶ 6 On November 5, 2002, the trial court granted COP's motion to dismiss. The trial court dismissed Jane's negligence and breach of fiduciary duty claims on the basis that the applicable statute of limitations had run. The trial court dismissed John's negligence and breach of fiduciary duty claims on the basis that section 78–12–25.1(5) allows an action for negligently permitting sexual abuse to be brought against only "a living person." The trial court dismissed Plaintiffs' claims for intentional infliction of emotional distress for the same reasons it dismissed their other claims, and also because their claims were prohibited under the Establishment Clause of the First Amendment to the United States Constitution. Finally, the trial court rejected John's claim that section 78–12–25.1(5) violated the open courts provision of the Utah Constitution because no special relationship existed between COP and John, and therefore, COP had no duty to protect John from Tilson.

¶ 7 In response to the trial court's ruling, Plaintiffs filed an amended complaint. On May 5, 2003, the trial court dismissed the amended complaint for the same reasons it had dismissed the original complaint. Plaintiffs timely filed their notice of appeal.

## STANDARD OF REVIEW

¶ 8 "Because the propriety of a 12(b)[ (6) ] dismissal is a question of law, we give the trial court's ruling no deference and review it under a correctness standard." *Ramsey v. Hancock*, 2003 UT App 319, ¶ 6, 79 P.3d 423

1. "On appeal from a motion to dismiss, we review the facts as they are alleged in the complaint. We accept the factual allegations in the complaint as true and consider all reasonable inferences to be drawn from those facts in a light most favorable to the plaintiff." *Ramsey v. Hancock*, 2003 UT App 319, ¶ 1 n. 1, 79 P.3d 423 (quotations and citations omitted).

2. COP administers the Church through a multilevel structure. At the local level are wards which are administered by bishops. Wards are grouped into stakes which are administered by stake presidents.

3. According to Plaintiffs, "[a] High Priest is held out by the church as someone who is 'morally worthy' and deserving of the trust of its members."

4. None of the alleged sexual abuse occurred on COP property or in connection with a COP sponsored activity.

(alteration in original) (quotations and citations omitted). "In its review, this court 'must accept the material allegations of the complaint as true, and the trial court's ruling should be affirmed only if it clearly appears the complainant can prove no set of facts in support of his or her claims.'" *Id.* (citation omitted).

## ANALYSIS

¶ 9 Jane argues that the trial court erred when it dismissed her claims on the basis that they were time-barred. She asserts that COP fraudulently concealed Tilson's acts of sexual abuse for thirty years, thereby preventing her from discovering the facts underlying those claims until 2002. John argues that the trial court erred when it dismissed his claims on the basis that Utah Code Annotated section 78–12–25.1(5) (2002) allows civil actions for negligently permitting sexual abuse to "be brought only against a living person." According to John, section 78–12–25.1(5) is "a reference to the extended statute of limitations for sex abuse victims granted in the statute, and is applicable only in the event that a sex abuse victim asserts delayed discovery of the actual act of sexual abuse." John also argues that even if this court concludes that the trial court properly interpreted section 78–12–25.1, the statute is unconstitutional because it violates Article I, Section 11 of the Utah Constitution. Both Plaintiffs argue that the trial court erred when it concluded that COP had no duty to warn them about Tilson's prior acts of child sexual abuse. According to Plaintiffs, a special relationship existed between COP and Tilson and between COP and Plaintiffs that gave rise to such a duty. Finally, both Plaintiffs argue that the trial court erred when it concluded that their claims were prohibited under the First Amendment to the United States Constitution. Plaintiffs contend whether COP owed them a duty was unrelated to COP's ecclesiastical doctrine.

¶ 10 Because it is a threshold question, we first consider whether COP had a common law duty to warn Plaintiffs about Tilson's prior acts of child sexual abuse. "Traditionally, the common law has not required a defendant to prevent harm when doing so requires that the defendant control the conduct of another person or warn others about such conduct." *Owens v. Garfield,* 784 P.2d 1187, 1189 (Utah 1989). However, an exception to this rule exists when

> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives the other a right to protection.

*Higgins v. Salt Lake County,* 855 P.2d 231, 236 (Utah 1993) (quoting Restatement (Second) of Torts § 315 (1977)). Moreover, "in determining the existence of a duty, we examine such factors as the identity and character of the actor, the victim, and the victimizer, the relationship of the actor to the victim and the victimizer, and the practical impact that finding a special relationship would have." *Id.* at 237. With this background in mind, we examine whether COP had a special relationship with either Tilson or Plaintiffs.

¶ 11 In support of their argument that COP had a special relationship with Tilson, Plaintiffs rely primarily on language from *Higgins,* stating that a special relationship exists if

> the one causing the harm has shown him- or herself to be uniquely dangerous so that the actor upon whom the alleged duty would fall can be reasonably expected, consistent with the practical realities of that actor's relationship to the one in custody or under control, to distinguish that person from others similarly situated, to appreciate the unique threat this person presents, and to act to minimize or protect against that threat.

*Id.* at 237. What Plaintiffs have failed to mention, however, is that this analysis applies "[i]n the context of a claim that an actor having *custody and control* of another owed a duty to prevent harm to or by that other." *Id.* (emphasis added). Here, Plaintiffs have not alleged any facts demonstrating that COP had custody and control over Tilson at the time he sexually abused Plaintiffs. For example, Plaintiffs do not allege that Tilson

was a COP agent or employee, or that he was a member of COP's clergy. Nor do they allege that the abuse occurred on COP property, during a COP sponsored activity, or in connection with Tilson's position as a High Priest or scout leader. Although Plaintiffs do allege that "COP had the power to remove Tilson as a High Priest, and even had the power to excommunicate him from the church," these facts alone are insufficient to establish that COP had custody and control over Tilson.[5] Therefore, we conclude that no special relationship existed between COP and Tilson at the time Plaintiffs were sexually abused that would give rise to a duty on COP's part to warn Plaintiffs about Tilson.

¶ 12 We next turn to Plaintiffs' argument that COP had a special relationship with them at the time they were sexually abused because they were child church members at risk of harm by Tilson. According to Plaintiffs, COP "had a system of disciplinary action in place which was meant to, among other things, identify sexual predators and other dangerous individuals within the membership in order to protect innocent members from harm." However, a special relationship that would have created a duty on COP's part to protect Plaintiffs from Tilson would have existed only if they had been in COP's custody at the time Tilson sexually abused them. See Young v. Salt Lake City Sch. Dist., 2002 UT 64, ¶ 14, 52 P.3d 1230 (noting that when a party "lacks custody, it has no protective obligation and no special relationship exists").[6]

¶ 13 In Meyer v. Lindala, 675 N.W.2d 635 (Minn.Ct.App.2004), the court specifically considered whether a defendant church had a special relationship with its plaintiff child members, who were sexually abused by another church member, while outside the defendant's custody. See id. at 637–38. Like the instant case, the plaintiffs alleged that the defendant had concealed its knowledge that the perpetrator had previously engaged in child sexual abuse. See id. at 638. Although the abuse did not occur on the defendant's property and was unconnected to the defendant, the plaintiffs argued that the defendant had a special relationship with them because it provided them with faith-based advice. See id. at 640. The court rejected this argument, noting that "[p]roviding faith-based advice or instruction, without more, does not create a special relationship." Id.; see also Bryan R. v. Watchtower Bible & Tract Soc'y, Inc., 738 A.2d 839, 847 (Me.1999) ("The allegation[s] that [the plaintiff church member] placed 'substantial trust and confidence' in the elders of the church and trusted them 'to protect him and guide him' . . . are wholly insufficient to make out a claim of a special relationship between the organization and its members.").

¶ 14 As in Meyer, the sexual abuse in this case was unconnected to COP and did not occur while Plaintiffs were in COP's custody. Accordingly, we also reject Plaintiffs' argument that COP membership alone was sufficient to establish a special relationship between COP and Plaintiffs that created a duty on COP's part to warn Plaintiffs about Tilson.[7] Moreover, because we conclude that COP did not have a duty to warn Plaintiffs about Tilson's history of child sexual abuse,

---

5. Because COP did not have custody or control over Tilson, Plaintiffs' claim that "COP had thirty years of notice that Tilson was 'uniquely dangerous'" is irrelevant. Although Tilson's history certainly suggests that it was foreseeable that he would sexually abuse other minor COP members, the Utah Supreme Court has emphasized that foreseeability of harm, by itself, is unrelated to whether a special relationship exists. See Young v. Salt Lake City Sch. Dist., 2002 UT 64, ¶ 17, 52 P.3d 1230.

6. Plaintiffs also argue that a special relationship existed because COP's president wields absolute and ultimate authority and consequently he had "the power to greatly minimize the harm Tilson was causing." However, "the ease with which a party may fulfill a duty is irrelevant to whether a special relationship exists because that question assumes a party already has a duty." Young, 2002 UT 64 at ¶ 17, 52 P.3d 1230.

7. We also note that Utah law provides for criminal sanctions for failing to report suspected child sexual abuse. See Utah Code Ann. § 62A–4a–403 (Supp.2003). However, "[w]hen a statute makes certain acts unlawful and provides criminal penalties for such acts, but does not specifically provide for a private right of action, we generally will not create such a private right of action." Youren v. Tintic Sch. Dist., 2004 UT App 33, ¶ 4, 86 P.3d 771. Therefore, COP's failure to report Tilson's acts of child sexual abuse did not create a private cause of action for Plaintiffs.

based on a lack of a special relationship with either Tilson or Plaintiffs, it is unnecessary to consider Plaintiffs' other claims.

## CONCLUSION

¶ 15 COP had no common law duty to warn Plaintiffs about Tilson's prior acts of child sexual abuse because no special relationship existed between COP and either Plaintiffs or Tilson. Tilson was not a COP employee, agent, or clergy member. Although COP conferred upon Tilson the positions of High Priest and scout leader, the sexual abuse suffered by Plaintiffs occurred in Tilson's house and was unrelated to COP or any of its activities. Therefore, the decision of the trial court is affirmed.

¶ 16 WE CONCUR: JAMES Z. DAVIS and WILLIAM A. THORNE JR., Judges.